# Illinois Official Reports

## Appellate Court

---

### *People v. Cacini*, 2015 IL App (1st) 130135

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL CACINI, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket Nos. 1-13-0135, 1-13-3166 cons. |
| Filed | December 11, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-8303; the Hon. Mary Margaret Brosnahan, Judge, presiding. |
| Judgment | No. 1-13-0135, Reversed and remanded.<br>No. 1-13-3166, Appeal dismissed. |
| Counsel on Appeal | Breen & Pugh, of Chicago (Thomas M. Breen, Jonathan M. Brayman, Todd S. Pugh, and Robert W. Stanley, of counsel), for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Carol L. Gaines, and Jessica R. Ball, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion.<br>Presiding Justice Reyes and Justice Palmer concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a jury trial, defendant Michael Cacini was convicted of attempted first degree murder of Chicago police officer Kristopher Rigan and aggravated battery of Officer Thomas O'Shaughnessy. He was sentenced to 20 years' imprisonment for attempted first degree murder consecutive to 3 years' imprisonment for aggravated battery.

¶ 2    Defendant filed a direct appeal challenging his convictions and, while this direct appeal was pending, a postconviction petition challenging his conviction for a substantial deprivation of his constitutional rights. This court consolidated defendant's direct appeal with his appeal from the denial of his postconviction petition.

¶ 3    In this consolidated appeal, defendant contends: (1) a new trial is necessary due to critical omissions from the jury instructions and because the State knowingly adduced false evidence; (2) he was not proven guilty beyond a reasonable doubt; (3) the trial court erred by failing to consider information concerning complaints against the police officers; (4) defendant was prejudiced by the trial court's denial of his continuance request; and (5) the trial court erred by summarily dismissing defendant's postconviction petition at the first stage of those proceedings.

¶ 4    We reverse the judgment of the trial court in the direct appeal and remand this case for further proceedings. We hold that the trial court's failure to instruct the jury on the State's burden to disprove defendant's justification for his use of force in self-defense was plain error. We also hold that the trial court did not abuse its discretion in concluding after an *in camera* inspection that confidential records of complaints against the arresting police officers were not admissible at trial or subject to disclosure. We dismiss as moot defendant's appeal of the summary dismissal of his postconviction petition.

¶ 5                                    I. BACKGROUND

¶ 6    This cause arose from defendant's arrest during the early morning hours of April 20, 2010, after officers Rigan and O'Shaughnessy confronted defendant while he was in his car, a struggle ensued, and he sped away.

¶ 7    At the February 2012 trial, officers Rigan and O'Shaughnessy testified that they were working the midnight shift on the date of the incident. They were in an unmarked Crown Victoria automobile, which had green-lettered municipality license plates and a police light package that included blue strobe lights on the front windshield, in each rear door window, and a light bar across the back window. The police vehicle also had a siren and strobe lights in the headlights and taillights. The officers were in civilian clothes. Rigan wore a black baseball cap, a black long-sleeved shirt, a bulletproof vest, a black zip-up sweatshirt jacket over his vest, and khaki pants. His police star was around his neck on a metal chain and was hanging on the outside of his vest and jacket. His jacket was unzipped and a Chicago police department star was embroidered on his vest. O'Shaughnessy wore a T-shirt, a bulletproof vest, a black zip-up sweatshirt jacket and jeans. His name, star, and district were embroidered on the chest of his vest and his jacket was unzipped. Both officers wore their full duty belts.

¶ 8    About 3 a.m., the officers saw a dark colored Mercedes automobile driven by defendant pull toward the curb at approximately 15 West Division Street. The rear tires of defendant's car were blocking traffic. Defendant engaged in a conversation with a man standing on the

side of the street. The officers recognized the man as Keith Harris, a known panhandler and drug dealer in that area. Harris entered the passenger side of defendant's car, they gave each other a knuckle bump or handshake, and then defendant drove off. The officers suspected that defendant and Harris were involved in a narcotics transaction, so the officers drove around the block and saw defendant's car again on Elm Street, which is a one-way street. The officers turned onto Elm Street, proceeding in the wrong direction toward defendant's car. Accordingly, O'Shaughnessy, who was driving, activated the emergency lights of the police vehicle to prevent any accidents. Defendant stopped his car in a lane of traffic near a bar, and Harris exited the car and walked quickly toward the bar. O'Shaughnessy stopped his car 10 to 15 feet in front of defendant's car, and he and Rigan exited the car. O'Shaughnessy approached Harris while Rigan approached the driver's side of defendant's car.

¶ 9        Rigan testified that the driver's window was down and defendant yelled, "F*** you. You are not getting in my car without a search warrant." Defendant then rolled up the window, and Rigan responded by saying, "Police, please turn off the car." Rigan continued to walk toward the car and again announced his office and asked defendant to turn the car off and exit the vehicle. Rigan then opened the car door, and defendant punched him in the chest, face and jaw several times. Rigan called to O'Shaughnessy for help.

¶ 10       Rigan testified that defendant said he had a license and insurance, but Rigan told him that he was under arrest for punching him and to get out of the car. Defendant did not comply but, rather, swore several times and said, "I am not going to jail unless you drag me out of here in cuffs." Rigan continued to announce his office, and O'Shaughnessy arrived at the driver's side of the car and tried to assist him. Defendant then grabbed Rigan's bullet proof vest and the side of his duty belt that held his gun and pulled Rigan into the car. Defendant continued to punch Rigan and moved for the gear shift. Rigan tried to remove the keys from the ignition, but defendant put the car in drive and floored it while Rigan was still in the car with his legs, from the thighs down, hanging out the door. The car door flung back and squeezed Rigan's legs, pushing him further into the car. Rigan yelled to O'Shaughnessy to shoot because Rigan felt that his life was in danger. O'Shaughnessy fired a round as defendant drove away. Defendant punched Rigan several more times and then pushed him out of the car while it was traveling at a high rate of speed. Rigan was thrown from the car. His head bounced off the pavement, and his jaw snapped shut. The left tire of defendant's car ran over Rigan's legs and the top of his body, including his shoulder. Defendant sped away.

¶ 11       Rigan testified that O'Shaughnessy drove up next to him, helped him into the police vehicle, and chased after defendant. When they turned onto Division Street, Rigan yelled at O'Shaughnessy to let him out of the car; Rigan could not move anything from his shoulder to his legs on the left side of his body. O'Shaughnessy stopped, and Rigan "hucked" himself out of the car and told O'Shaughnessy to continue chasing defendant and to call him an ambulance. Rigan remained in the street, in and out of consciousness, until an ambulance arrived and took him to the hospital. Rigan gave a verbal report to a detective at the hospital after Rigan had been sedated. As a result of this incident, Rigan suffered a dislocated shoulder, bruises and abrasions to his legs, lacerations on his elbow, arm and hand, and some cracked teeth. He had several surgeries to replace those teeth. He missed work because of his injuries, his arm remained in a sling for approximately one month, and he received physical therapy for his shoulder injury for approximately six months.

¶ 12    Rigan thought Harris was fleeing from the police when he exited defendant's car. Rigan never heard defendant yell, "Don't steal my car, don't take my car, I am not getting out of the car." Rigan explained that he did not try to remove defendant from the car until after defendant struck him.

¶ 13    O'Shaughnessy testified that when he exited his police vehicle, Harris complied when O'Shaughnessy told him to "come here." They stood in front of the police vehicle, by the driver's side, and O'Shaughnessy saw Rigan approach defendant's car, announce his office and ask defendant to exit the car. O'Shaughnessy also heard defendant yelling. O'Shaughnessy looked toward Rigan and saw that he and defendant were engaged in a verbal altercation. The car door was open and defendant began hitting Rigan with a closed fist. Defendant was still yelling, and Rigan called for help.

¶ 14    O'Shaughnessy put one handcuff on Harris and called for additional cars as he walked Harris over to defendant's car. O'Shaughnessy had Harris kneel down by the driver's side door of defendant's car. Defendant was in the driver's seat, still had his seat belt on, and yelled, "I have a license, I have insurance, you can't take me out of the car, I have a license." Rigan repeatedly announced his office and told defendant to exit the vehicle. When O'Shaughnessy reached into the car to try to release defendant's seatbelt, defendant reached for the gear shift and put the car in drive. O'Shaughnessy removed himself from the car, but Rigan was unable to get out of the car because defendant was holding Rigan's vest. Rigan tried to get the ignition key, but defendant accelerated the car. As the car sped away, the door slammed closed on the officers. The door hit O'Shaughnessy on his left arm, elbow, hand and leg. Rigan called for help and told O'Shaughnessy to shoot. The lower half of Rigan's body was hanging outside the car and his legs were being dragged on the ground. O'Shaughnessy fired his gun, and the bullet hit the rear driver's side window, went through the window, and hit the backseat headrest. Then Rigan came completely out of the car and landed on the street. Defendant's vehicle ran over Rigan, did not stop, and continued down the street.

¶ 15    O'Shaughnessy called for assistance and provided a description of defendant's car. O'Shaughnessy drove to Rigan, put him in the car, and pursued defendant, but Rigan was in too much pain so O'Shaughnessy let him out of the car. As O'Shaughnessy caught up to defendant's car, one marked squad car and one unmarked squad car, both with their lights and sirens activated, met up with O'Shaughnessy's car. Defendant, however, did not stop his vehicle until the area of 1700 North Clark Street, about 10 blocks from where the incident began.

¶ 16    O'Shaughnessy testified that he and officers Bart Murphy and Steven White exited their vehicles. Defendant opened his car door and stuck his hands out. He had a cell phone in one hand and said, "I have a license, I have a license." Defendant resisted when Officer Murphy tried to remove him from his car. Defendant did not punch or kick any of the officers that arrested him, but he flailed his arms and was uncooperative before being handcuffed.

¶ 17    Keith Harris testified that he had three prior felony convictions: two for possession of a controlled substance with intent to deliver in 2002 and one for possession of a look-alike substance in 2004. On the date in question, he was panhandling near a donut shop that was boarded up and closed. Defendant drove up and asked him where he could get a drink. Harris walked toward the car, and defendant told him to get in. They talked about marijuana and women. At some point, defendant also said that he hoped Harris would not "jack" him for his

- 4 -

car. Harris thought defendant did not trust him because Harris was black. They drove to a bar on Division Street, and Harris got out and saw that the bar was closed. Harris talked to some people but defendant was impatient to go, and Harris got back into defendant's car. They drove onto Elm Street. Harris got out of the car, went up to a bar, looked in the window, and saw that it was closed. Then an unmarked detective's car, with the green "M" license plate, drove up. Harris did not remember if the emergency lights were on. officers O'Shaughnessy and Rigan, wearing bulletproof vests, badges around their necks, and guns in their holsters, exited the car. The vests were visible even though the vests were worn underneath something. Harris knew O'Shaughnessy and Rigan; they had been good to him before and had never arrested him.

¶ 18 Harris testified that O'Shaughnessy grabbed him, told him to come to the car, and put a handcuff on him. Rigan walked toward defendant's car. Harris and O'Shaughnessy were talking, and Harris did not pay attention to Rigan until O'Shaughnessy looked toward Rigan and defendant, who were fighting. Specifically, Harris saw defendant hit and kick Rigan and saw Rigan fight back. O'Shaughnessy dragged Harris over to defendant's car. Harris told O'Shaughnessy he was hurting him, so O'Shaughnessy let go and began helping Rigan. Harris stumbled and fell. He looked up and saw defendant fighting with both officers. As Harris stood up, defendant drove off and ran over Harris's feet and skinned the side of his leg. Defendant's car was dragging Rigan, whose legs were outside the vehicle. Harris heard a gunshot and ducked his head. O'Shaughnessy jumped into the police vehicle and took off. Harris waited at the scene until the police arrived. Harris never sold defendant drugs, and defendant never asked him for drugs. Harris never heard defendant tell the officer "don't steal my car."

¶ 19 Officer White testified consistently with Officer O'Shaughnessy concerning the pursuit and apprehension of defendant. Officer White added that when Officer Murphy grabbed defendant by the shoulders and started to pull him from the car, defendant slid out of his jacket and a struggle ensued. Defendant kept pulling away from Officer Murphy, pushing off of him. After defendant was arrested, the officers found a small bag of suspect cannabis in his jacket pocket. He also had $400 in his right pants pocket and a small dog in the backseat of his car.

¶ 20 Detective Ed Heerdt testified that he was assigned to investigate this case around 3:30 a.m. on the date of the incident. He contacted the mobile crime lab and looked for video evidence that may have captured the incident. A police department camera at the corner of State and Elm streets was pointed in another direction and did not capture the incident. Furthermore, a high-rise building's camera on Dearborn Street did not capture the incident. In addition, a manager from the bar on Elm Street informed Heerdt that the bar's video surveillance shut off just before midnight, so the bar's cameras were not operating during the incident. Moreover, a drug store at Division and Dearborn streets did not have any outside cameras that would have offered any evidentiary information.

¶ 21 The parties stipulated that the substance recovered from defendant's jacket tested positive for 0.8 grams of cannabis.

¶ 22 Defendant testified that he drove from his home in Arlington Heights around 1:15 a.m. after having an argument with his wife. He was wearing his glasses and was not under the influence of drugs or alcohol. His dog was in the backseat, and he drove to downtown Chicago to get a drink. He saw Harris, whom he did not know, walk out of a donut shop.

They made eye contact, and Harris walked toward defendant's car. Defendant rolled down his window and asked if there was a bar open. Harris offered to show him to a bar, and defendant let him in his car because he seemed friendly. The first bar they went to on Division Street was closed, so they drove to another bar on Elm Street. Harris got out of the car, walked up to the bar, and looked in the window. A car sped down Elm Street and stopped in front of defendant's car. Defendant did not see any markings on the car or emergency lights to indicate it was a police vehicle. Two men jumped out of the car. One ran toward Harris and the other, who looked like he had a gun on his hip, came toward defendant's car. Neither man identified himself as a police officer.

¶ 23 According to defendant, Rigan yelled at him to put his car in park and turn it off. Defendant initially thought Rigan was a police officer, so he listened; however, when Rigan yelled at him "to get the f*** out of the car," defendant thought he was being carjacked. Rigan opened defendant's car door and a struggle ensued. Rigan hit defendant three times in the head with a fist and tried to pull him out of the car. Defendant never said anything to Rigan but defended himself and tried to get away. When O'Shaughnessy and Harris came to defendant's car door, he thought they were going to kill him. Defendant grabbed the steering wheel, started his car, and put it into gear. He heard O'Shaughnessy yell, "I'm going to kill you" and saw O'Shaughnessy fire his gun as defendant drove away. Rigan was still hitting him and trying to pull him from the car. The car door made contact with Rigan as it was shutting. Rigan let go and fell off defendant's car. Defendant did not feel his car run over anything, and he never pointed or accelerated his car at the men. Defendant said he just drove away and did not call the police.

¶ 24 Defendant testified that, at some point, he was stopped by the police but did not know why he was pulled over. He exited his car with his hands up but the police were pointing guns at him. He did not struggle and complied when the police told him to get on the ground. The police kicked him, kneed him in the back, and almost suffocated him by standing on the side of his head when they took him into custody. Defendant cried out to Jesus for help, said, "Thank God" when they walked him to a police car, and asked them to "please, just put [him] into the car."

¶ 25 Defendant asserted that he never grabbed anyone by the vest or kicked anyone. He did not intentionally injure anybody that night. Defendant denied hitting or kneeing Rigan, dragging Rigan into his car, or pushing Rigan out of his car. Defendant asserted that the only thing that hit Rigan was the car door and that Rigan let go of defendant and fell when defendant drove off.

¶ 26 The jury found defendant guilty of attempted first degree murder of Rigan, aggravated battery of Rigan, and aggravated battery of O'Shaughnessy. Thereafter, defense counsel subpoenaed records from the Office of Professional Standards (OPS) and the Independent Police Review Authority (IPRA) for officers Rigan and O'Shaughnessy. The trial court conducted an *in camera* review of the documents that were returned to the court pursuant to those subpoenas. The court concluded that it would not have tendered to the defense prior to trial the OPS files regarding prior allegations of police misconduct unrelated to defendant's case because those files did not meet the requirements for admissibility. The court also noted that all the files relating to Rigan and O'Shaughnessy either exonerated the officers or concluded that the misconduct allegations were unfounded or not sustained. The trial court did tender to the defense IPRA records, in their entirety, relating to the investigation in the

instant case and employment attendance records. The State indicated that it never received any such IPRA records, and the court noted that the defense had a duty to copy and tender those documents.

¶ 27 The trial court denied defendant's posttrial motions and sentenced him to 20 years imprisonment for attempted murder of Rigan consecutive to 3 years for aggravated battery of O'Shaughnessy. Defendant appealed his convictions and sentences.

¶ 28 While that appeal was pending, defendant filed a postconviction petition alleging that his trial counsel rendered ineffective assistance by (1) providing unreasonable advice that his case was winnable and not to plea; (2) failing to use medical records to contradict the extent of Rigan's injuries; (3) failing to investigate all witnesses who could have provided evidence favorable to the defense; (4) failing to investigate the backgrounds of Rigan and O'Shaughnessy; and (5) failing to object to misrepresentations about the nature of Harris's prior convictions. Defendant also alleged that the State used perjured testimony to obtain his conviction and withheld exculpatory evidence. The trial court dismissed the petition as frivolous and patently without merit.

¶ 29 Defendant appealed the dismissal of his postconviction petition, and this court consolidated defendant's appeals.

¶ 30 II. ANALYSIS

¶ 31 On appeal, defendant contends: (1) a new trial is necessary due to critical omissions from the jury instructions and because the State knowingly adduced false evidence; (2) defendant was not proven guilty beyond a reasonable doubt; (3) the trial court erred by failing to consider information concerning complaints against the police officers; (4) defendant was prejudiced by the trial court's denial of his continuance request; and (5) the trial court erred by summarily dismissing defendant's postconviction petition at the first stage of those proceedings.

¶ 32 A. Jury Instruction Error

¶ 33 Defendant contends the trial court committed reversible error by failing to inform the jury that the State had the burden to prove beyond a reasonable doubt that defendant's use of force was not justified. Specifically, defendant argues that although the trial court properly ruled that the evidence justified giving the jury self-defense instructions, the court failed to instruct the jury that, in order to sustain the charges of attempted first degree murder of Rigan and aggravated battery of both police officers, the State had to prove beyond a reasonable doubt that defendant was not justified in using the force that he used. Defendant also argues that the trial court contributed to this error when it gave the jury instructions according to their published chronological sequence and, thus, confused the jury by not giving the affirmative defense definition instructions after the offense definition instructions.

¶ 34 According to the record, during a jury instruction conference, the defense requested a self-defense instruction. The defense argued that, even though the law is clear that a person cannot resist even an unlawful arrest, the jury could believe defendant's testimony that he believed the event here was not an arrest. The defense argued that everybody testified to defendant's use of force and defendant admitted that he put his foot on the accelerator and drove off because he feared he was being attacked by somebody with a gun.

¶ 35     The State objected, arguing that the instruction was not justified because defendant did not admit to intentionally using any type of force in self-defense. The State noted that defendant denied striking Rigan or running him over with the car and claimed it was accident that, as defendant drove away, the car door swung closed and hit Rigan, who then fell off the car. The State also argued that, assuming *arguendo*, defendant used some force to thwart Rigan from pulling him out of the car, defendant was not justified in using force to drag Rigan from a moving vehicle and then throw him out of the car.

¶ 36     The trial judge stated defendant testified that: he was sitting in his car doing nothing wrong when he was confronted by Rigan and O'Shaughnessy and did not know they were police officers; he was not the aggressor and saw that Rigan had a gun; defendant feared for his life when they tried to "rip him out of the car"; defendant admitted "taking off and hitting one with a car door after a struggle"; and O'Shaughnessy fired his gun, hitting the headrest of the rear seat. The trial court noted that it was not the court's role to judge defendant's credibility and concluded the evidence was sufficient to warrant giving the self-defense instruction.

¶ 37     The trial court instructed the State to add to the definition instructions for the charged aggravated battery offenses, in accordance with the guidance in Illinois Pattern Jury Instructions, Criminal, No. 11.15 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 11.15), the phrase "without legal justification." When defense counsel asked if that phrase should also be added to the issue instructions for the aggravated battery offenses, the trial judge referred to the Committee Notes for IPI Criminal 4th No. 11.16 and confirmed that it was not necessary to include "without legal justification" in the issue instructions. Thereafter, the court told the State and defense to discuss the wording of the self-defense instructions and the court would finalize the instructions the next morning. The defense requested the instruction on the use of force in defense of property because defendant thought he was being carjacked, and the trial court stated it would rule on that issue the next morning. The next morning, the trial court allowed, over the State's objection, the instruction on the use of force in defense of property.

¶ 38     The trial court gave the jury issue instructions for attempted first degree murder of Rigan, a peace officer; aggravated battery of Rigan, a peace officer, with great bodily harm; and aggravated battery of O'Shaughnessy, a peace officer. However, contrary to the guidance in IPI Criminal 4th No. 24-25.06A, Committee Note, none of these issues instructions informed the jury that the State had the burden to prove that "the defendant was not justified in using the force which he used" as the final proposition of the charged offenses.

¶ 39     Over the State's objection, the following self-defense instructions were also given to the jury:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.
>
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself.
>
> A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to prevent another's wrongful interference with personal property lawfully in his possession.

However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent the commission of aggravated vehicular hijacking.

A person is not authorized to use force to resist an arrest which he knows is being made by a peace officer, even if he believes that the arrest is unlawful and the arrest in fact is unlawful."

¶ 40    Defendant asserts counsel sufficiently preserved review of this error where he sought self-defense instructions on the record and suggested the trial judge add "without legal justification" to the aggravated battery issues instructions. We disagree. The record establishes that defense counsel failed to tender IPI Criminal 4th No. 24-25.06A, failed to timely object to the absence of the instruction, and failed to include the issue in his posttrial motion. See *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007).

¶ 41    Defendant argues reversal is warranted under Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013) and this issue should be considered as plain error. Furthermore, defendant contends the State exacerbated this error by shifting the burden of proof during rebuttal closing argument when the prosecutor stated that the jury would see a self-defense instruction and defendant, with regard to his self-defense testimony, had the burden to prove that he fought. In the alternative, defendant contends trial counsel rendered ineffective assistance by failing to tender IPI Criminal 4th No. 24-25.06A or more clearly object to the omissions in the issue instructions.

¶ 42    Rule 451(c) provides that "substantial defects [in criminal jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). The purpose of Rule 451(c) is to permit correction of grave errors and errors in cases so factually close that fundamental fairness requires that the jury be properly instructed. *People v. Sargent*, 239 Ill. 2d 166, 189 (2010). Rule 451(c) is coextensive with the plain-error clause of Illinois Supreme Court Rule 651(a) (eff. Feb. 6, 2013). *Sargent*, 239 Ill. 2d at 189. The plain-error doctrine is a narrow and limited exception. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Under the plain-error doctrine, "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded" unless the appellant demonstrates plain error. Ill. S. Ct. R. 615. The plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *Piatkowski*, 225 Ill. 2d at 565. In both instances, the burden of persuasion remains with the defendant. *People v. Naylor*, 229 Ill. 2d 584, 593 (2008). The first step in plain-error review is to "determine whether a 'clear or obvious' error occurred at all." *People v. McLaurin*, 235 Ill. 2d 478, 489 (2009).

¶ 43    The State contends the trial court's failure to instruct the jury in accordance with IPI Criminal 4th No. 24-25.06A is not plain error because defendant was not entitled to instructions on self-defense and defense of property based on the evidence presented at trial. The State argues that defendant is improperly attempting to establish a theory of self-defense by combining defense testimony establishing defendant's fear for his safety with the State's evidence that defendant repeatedly hit and kicked Rigan, pulled him into the car, sped off, pushed Rigan out of the moving car and then ran over Rigan. The State notes that defendant

maintained throughout his testimony that he never intentionally injured anybody that night. Moreover, defendant denied ever striking the officers, never acknowledged that he ran over Rigan with his car, and at most testified that he struggled with Rigan and the car door hit Rigan as defendant drove away.

¶ 44    Self-defense is an affirmative defense (720 ILCS 5/7-14 (West 2008)), and "the raising of such a defense necessarily constitutes an admission by the defendant that he committed the crime for which he is being prosecuted" (*People v. Raess*, 146 Ill. App. 3d 384, 391 (1986)). Because self-defense presupposes the intentional use of force in defense of one's person, no instruction of self-defense is applicable to an act that a defendant denies committing. *People v. Chatman*, 381 Ill. App. 3d 890, 898 (2008). To obtain a jury instruction of self-defense, a defendant must establish some evidence of six factors: (1) force is threatened against a person, (2) the person is not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the person actually and subjectively believed a danger existed that required the use of the force applied, and (6) the person's beliefs were objectively reasonable. *People v. Jeffries*, 164 Ill. 2d 104, 128 (1995). "If the State negates *any one* of the self-defense elements, the defendant's claim of self-defense must fail." (Emphasis in original.) *Id.*

¶ 45    "[U]nless the State's evidence raises the issue involving the alleged defense, the defendant bears the burden of presenting evidence sufficient to raise the issue." *People v. Everette*, 141 Ill. 2d 147, 157 (1990) (holding a homicide defendant was entitled to a self-defense instruction where there was some evidence in the record which, if believed by the jury, would have supported the defense, even though the defendant testified that he accidentally killed the victim). A theory of self-defense may properly be raised even if a defendant's own testimony is inconsistent with that theory. *People v. Bailey*, 108 Ill. App. 3d 392, 399 (1982). However, a defendant does not meet his burden to raise the theory of self-defense by combining the State's evidence of the defendant's act with his own testimony that he was in fear of his safety. *People v. Freeman*, 149 Ill. App. 3d 278, 281 (1986). A defendant is entitled to a jury instruction on self-defense even if very slight or only some evidence exists to support the theory of self-defense. *People v. Lee*, 213 Ill. 2d 218, 224 (2004); *Everette*, 141 Ill. 2d at 156-57.

¶ 46    "There must be some evidence in the record to justify an instruction, and it is within the trial court's discretion to determine which issues are raised by the evidence and whether an instruction should be given." *People v. Mohr*, 228 Ill. 2d 53, 65 (2008); see also *People v. Jones*, 219 Ill. 2d 1, 31 (2006). But see *People v. Washington*, 2012 IL 110283, ¶ 19 (where the court was determining whether an instruction on second degree murder must be given as a mandatory counterpart when the evidence supports the giving of a jury instruction on self-defense, the court stated the "question of whether sufficient evidence exists in the record to support the giving of a jury instruction is a question of law subject to *de novo* review"). In the instant case, the question of whether there was sufficient evidence to support the self-defense jury instruction is a question of fact, not of law, and thus is properly within the discretion of the trial court. See *People v. DiVincenzo*, 183 Ill. 2d 239, 251 (1998) (noting that whether an involuntary manslaughter instruction is warranted depends on the facts and circumstances of each case).

¶ 47    Although we agree with the State that its evidence did not serve to raise the affirmative defense of self-defense, we reject the State's argument that the trial court erred by finding

there was sufficient evidence to support the giving of the self-defense instruction. The State presented evidence that defendant resisted; however, the State did not present evidence that his resistance was out of fear for his safety where the police testified that they activated the police lights of their unmarked vehicle, announced their office as they approached defendant, and wore their badges or stars outside of their open jackets and bulletproof vests but defendant was hostile, swore, and refused to exit his car without a search warrant.

¶ 48    Nevertheless, putting aside the issue of defendant's credibility, he did testify that he used some force to get away from Rigan, O'Shaughnessy and Harris. According to the record, defendant testified that he was sitting in his car doing nothing wrong and did not know Rigan and O'Shaughnessy were police officers; when Rigan confronted him and demanded that he exit his car, defendant feared he was being carjacked; Rigan opened defendant's car door, hit him multiple times and tried to pull him from the car; a struggle ensued and defendant defended himself and tried to get away without hitting, kicking, kneeing or grabbing Rigan; when O'Shaughnessy and Harris came to defendant's car door, defendant thought they were going to kill him; defendant started his car and drove away as O'Shaughnessy fired his gun; and the car door made contact with Rigan as it was shutting and Rigan let go and fell off defendant's car. Defendant asserted that he did not feel his car run over anything and did not intend to injure anyone. Although the defense presented very slight evidence of defendant's use of force against the officers, he did acknowledge that he struggled with Rigan and defended himself, he intentionally accelerated his car to get away from Rigan and O'Shaughnessy, who were standing at the open car door, and the door struck at least Rigan as it was shutting from the force of defendant driving away. We find no abuse of discretion by the trial court in giving the jury the defense of self and defense of property instructions based on the defense's very tenuous evidence concerning defendant's use of force.

¶ 49    Once the defense properly raises the affirmative defense of self-defense, the State bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *People v. Lee*, 213 Ill. 2d 218, 224 (2004). The jury, then, must be instructed as to this defense and the State's corresponding burden of proof. See *People v. Green*, 225 Ill. 2d 612, 622 (2007) ("[T]o ensure a fair trial, the trial court must instruct the jury on such basic matters as the elements of the offense, the presumption of innocence, and the burden of proof."). "It is of the essence of a fair trial that 'the jury not be permitted to deliberate a defendant's guilt or innocence of the crime charged without being told the essential characteristics of that crime.' " *People v. Ogunsola*, 87 Ill. 2d 216, 222 (1981) (quoting *People v. Lewis*, 112 Ill. App. 2d 1, 11 (1969)).

¶ 50    Instructions convey to the jury the correct principles of law applicable to the evidence presented at trial so that the jury may arrive at the correct conclusion according to the law and the evidence. *People v. Mohr*, 228 Ill. 2d 53, 65 (2008); *People v. Hudson*, 222 Ill. 2d 392, 399 (2006). We review *de novo* the question of whether the jury instructions accurately stated the applicable law to the jury. *People v. Parker*, 223 Ill. 2d 494, 501 (2006). Jury instructions are sufficient if, as a whole, the series of instructions fully, fairly and comprehensively apprised the jury of the relevant legal principles. *People v. Marcos*, 2013 IL App (1st) 111040, ¶ 68.

¶ 51    Rule 451(a) requires the trial court to use the Illinois Pattern Jury Instructions, Criminal, related to a subject when "the court determines that the jury should be instructed on the subject." Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013). IPI Criminal 4th No. 24-25.06 provides the

general definition of self-defense, which the trial court properly gave in this case. However, the Committee Note of this instruction also directs the trial court to give IPI Criminal 4th No. 24-25.06A when instructing the jury regarding self-defense, and the trial court failed to give that instruction, which would have informed the jury as the final proposition in the issues instructions for the attempted murder and aggravated battery offenses that the State bears the burden of proving beyond a reasonable doubt that defendant lacked justification in using the force he used.

¶ 52    We find that the failure to include IPI Criminal 4th No. 24-25.06A in the issues instructions for the attempted murder and aggravated battery offenses was error. See *People v. Berry*, 99 Ill. 2d 499, 507 (1984) (where the evidence was closely balanced on the issue of whether the shooting occurred as a result of self-defense, the court reversed the defendant's convictions, finding that the failure to instruct the jury on self-defense in the issues instructions was a critical error that severely threatened the fundamental fairness of the defendant's trial).

¶ 53    Having found that the trial court erred in omitting IPI Criminal 4th No. 24-25.06A, we must still consider whether an exception to defendant's forfeiture of the issue is warranted under the plain-error doctrine. Defendant does not argue under the first prong of plain error analysis that the evidence in this case was closely balanced, and we would not agree with any such argument where Harris corroborated the credible testimony of officers Rigan and O'Shaughnessy that defendant knew Rigan and O'Shaughnessy were police officers and defendant was the aggressor who hit and kicked Rigan, pulled Rigan into the car, and then dragged Rigan from the moving car and ran over him. Defendant's testimony, in contrast, was impeached in important aspects by Harris's testimony.

¶ 54    Under the second prong of plain-error analysis, "[p]rejudice to the defendant is presumed because of the importance of the right involved, regardless of the strength of the evidence." (Emphasis and internal quotation marks omitted.) *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). The supreme court has held that the second prong of the plain-error doctrine applies to structural error, which is "a systemic error which serves to erode the integrity of the judicial process and undermine the fairness of the defendant's trial." (Internal quotation marks omitted.) *Id.* at 613-14 (quoting *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009)).

¶ 55    After considering the jury instructions as a whole, we find that the trial court's omission of the self-defense instruction on the three offenses before the jury–attempted first degree murder of Officer Rigan and aggravated battery of officers Rigan and O'Shaughnessy–was second-prong plain error because the error was of such a magnitude as to have denied defendant a fair trial. The jury was informed that the State had the burden of proving defendant's guilt beyond a reasonable doubt, this burden remained on the State throughout the case, and defendant was not required to prove his innocence. However, the jury was never instructed that the State bore the burden to prove beyond a reasonable doubt that defendant's use of force in self-defense was not justified, and neither the prosecutor nor defense counsel mentioned this burden of proof during closing argument. *Cf. People v. Huckstead*, 91 Ill. 2d 536, 545 (1982) (the trial court's failure to instruct the jury on the State's burden to disprove the defendant's justification for his use of force was *not* plain error where the evidence was not closely balanced but the closing arguments of both the State and the defense *repeatedly and specifically emphasized* the State's burden to prove the defendant was not justified in the force he used).

¶ 56    Moreover, the prosecutor argued during rebuttal that the jury would see a self-defense instruction and defendant, with regard to his self-defense testimony, had the burden to prove that he fought. While we reject defendant's assertion that this statement by the prosecutor–which correctly stated the law that the defendant bears the burden to present some evidence of self-defense–improperly shifted the burden of proof, this statement may have confused the jury in the absence of proper jury instructions on the State's burden to disprove defendant's justification for his use of force.

¶ 57    Because the instructions failed to address the State's burden of proof concerning the self-defense claim, if the jury had relied upon the erroneous instructions as correct statements by the court of the task the jury was to perform, the jury could have concluded that it was incumbent on defendant to prove that he acted in self-defense and not held the State to the standard of proof beyond a reasonable doubt on all elements of the attempted first degree murder and aggravated battery offenses. In *Sullivan v. Louisiana*, 508 U.S. 275 (1993), the Court held that a constitutionally deficient reasonable-doubt instruction was a structural defect and not an error amenable to analysis by harmless-error standards. The deficient instruction described reasonable doubt as a *substantial* and *grave* doubt and thereby improperly suggested a higher degree of reasonable doubt than is required under the reasonable-doubt standard. *Id*. at 277 (citing *Cage v. Louisiana*, 498 U.S. 39 (1990)). The Court found that the misdescription of the burden of proof vitiated all the jury's findings because the essential connection to a beyond a reasonable doubt factual finding could not be made and a reviewing court could "only engage in pure speculation [about] its view of what a reasonable jury would have done." *Id*. at 281. Moreover, when a reviewing court engages in such speculation, " 'the wrong entity judge[s] the defendant guilty.' " *Id*. (quoting *Rose v. Clark*, 478 U.S. 570, 578 (1986)). Under the circumstances of the case before us, the credibility of defendant's self-defense testimony was an issue for the jury to decide and it would be speculation for this court to conclude the jury made the factual finding that the State met its burden to disprove defendant's justification of his use of force.

¶ 58    The State cites *People v. Washington*, 127 Ill. App. 3d 365, 379-80 (1984), and *People v. Rand*, 291 Ill. App. 3d 431, 441-42 (1997), for the proposition that a trial court's failure to give IPI Criminal 4th No. 24-25.06A does not constitute plain error where the evidence was not factually close. The State's reliance on *Washington* is misplaced; in that case, the court concluded that no grave error occurred because the given jury instructions–which instructed the jury on the State's burden to disprove self-defense on the murder charge but failed to so instruct the jury concerning the attempted murder charge–in combination with the closing arguments of both the prosecutor and defense counsel–which emphasized and stressed the State's burden to disprove self-defense as to both the murder and attempted murder charges–adequately informed the jury. Here, in contrast, the jury received no instruction on any of the three charged offenses about the State's burden to disprove self-defense, and the closing arguments did not mention the State's burden to disprove self-defense. In *Rand*, the court concluded, without any discussion of the jury instructions given or the totality of the circumstances in that case, that the "purported error" of failing to give IPI Criminal 4th No. 24-25.06A "was neither grave nor such that it denied defendant fundamental fairness." 291 Ill. App. 3d at 442. In the absence of any analysis of second-prong plain error in *Rand*, we find that case unpersuasive and decline to follow it.

¶ 59 Under the circumstances of this case, where the evidence was not closely balanced but the issues instructions failed to inform the jury of the State's burden to disprove defendant's justification for his use of force, the closing arguments did not mention this burden of proof to the jury, and the jury may have been confused by the prosecutor's statement concerning the defendant's burden to present some evidence of self-defense, we conclude that the erroneous jury instructions were of such a magnitude as to constitute second-prong plain error. Accordingly, we reverse defendant's convictions for attempted first degree murder and aggravated battery and remand for a new trial on those offenses.

¶ 60 Because the evidence against defendant, when viewed in the light most favorable to the prosecution, was sufficient to convict him of attempted first degree murder and aggravated battery, double jeopardy does not bar his retrial for those offenses. See *People v. Ward*, 2011 IL 108690, ¶ 50; *People v. Smith*, 185 Ill. 2d 532, 541 (1999); see also *People v. Gargani*, 371 Ill. App. 3d 729, 736 (2007) ("When considering the sufficiency of the evidence, a reviewing court does not retry the defendant."). Here, the State's evidence established that defendant used his car as a weapon with the requisite intent to kill Rigan and cause bodily harm to Rigan and O'Shaughnessy when defendant hit and kicked Rigan, pulled him into the car and held onto his vest, put the car in gear and sped off while the officers were at the car door, hit both officers with the car door, and dragged Rigan's legs on the pavement and then pushed him out of the car and ran over him.

¶ 61 Defendant also argues the trial court erred when it gave the jury instructions according to their published chronological sequence. Specifically, defendant complains the trial court placed the affirmative defense definition instructions near the end of the jury instructions instead of after the offense definition instructions and thereby prevented the jurors from deducing the correct application of the justified use of force principles.

¶ 62 The introduction to chapters 24 and 25 of the IPI Criminal 4th states:

"The Committee believes that elements or issues of an affirmative defense should be treated in two ways: *first*, by definition following the definition of the crime with which the defendant is charged; *second*, in the same instruction with the issues or elements of the crime and the State's burden of proof. [Citation.] The appropriate issues and burden of proof defenses instruction should be superimposed upon the appropriate issues and burden of proof crimes instruction so that the jury receives a single instruction covering all of the issues in the case." (Emphases in original.) IPI Criminal 4th No. 24-25.00, Introduction, at 288.

According to the record, instead of reading the definition of the affirmative defense instruction after the definition instructions for attempted first degree murder and aggravated battery, the trial court read the instructions in chronological order.

¶ 63 Defendant has forfeited review of this issue by failing to timely object and include this specific issue in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Such forfeiture notwithstanding, there is no indication that the placement of the affirmative defense instructions confused or misled the jury and resulted in prejudice to defendant. The comments of the supreme court's jury instruction committee are not law (*People v. Edwards*, 343 Ill. App. 3d 1168, 1176 (2003)), and the committee's recommendations and comments do not conclusively determine the propriety of the trial court's instructions (*Lange v. Freund*, 367 Ill. App. 3d 641, 645 (2006)). Trial courts have considerable discretion in deciding how to instruct the jury (*People v. Atkins*, 161 Ill. App. 3d 600, 611 (1987)), and the order of

giving instructions lies within the discretion of the trial court (*United States v. De Marie*, 226 F.2d 783 (7th Cir. 1955)). Although it is preferable to follow the definition of the charged offenses with the self-defense definition instruction (*People v. Bigham*, 226 Ill. App. 3d 1041, 1046 (1992)), the trial court's determination of the sequence of the instructions was not an abuse of discretion.

¶ 64                     B. *In Camera* Inspection of Complaints Against the Officers

¶ 65        Because this issue may arise on retrial, we review defendant's argument that the trial court erred in ruling, after an *in camera* review of the OPS files for officers Rigan and O'Shaughnessy, that the records were not relevant or admissible and would not be disclosed to the parties. Defendant alleges the trial court abused its discretion in its review of the OPS files and asks this court to review the OPS files *in camera* and unseal those files. Defendant also argues the State committed *Brady* and discovery violations by failing to obtain and disclose the OPS files prior to trial. Defendant asserts that if the OPS records had been disclosed, the jury would have learned that the officers had a marked history for behaving violently, defendant's testimony that Rigan physically accosted him without provocation would have been substantiated, and Rigan's testimony that he politely identified himself as a police officer only to be attacked by defendant would have been significantly undermined.

¶ 66        "When confidential records are sought in discovery, the trial court should review the records *in camera* and use its discretion to disclose only material information." *People v. Porter-Boens*, 2013 IL App (1st) 111074, ¶ 7. "The trial court has broad discretion in ruling on issues of relevance and materiality and its determination will not be disturbed absent an abuse of discretion." *People v. Williams*, 267 Ill. App. 3d 82, 87 (1994). Prior allegations of police misconduct may be deemed relevant to impeach an officer on the issues of bias, interest or motive to testify falsely. *Porter-Boens*, 2013 IL App (1st) 111074, ¶ 11. However, to be admissible, the evidence must not be too remote or uncertain and must raise an inference that the witness had something to gain or lose by his testimony. *People v. Nelson*, 235 Ill. 2d 386, 421 (2009); see also *People v. Hobley*, 159 Ill. 2d 272, 311-12 (1994) (specific allegations of police torture may be admissible only with sufficient indicia of timeliness and similarity). A witness may not be impeached on collateral or irrelevant matters (*People v. Williams*, 2011 IL App (1st) 093350, ¶ 33), so "[m]ere evidence of a civil suit against an officer charging some breach of duty unrelated to the defendant's case is not admissible to impeach the officer" (*People v. Coleman*, 206 Ill. 2d 261, 279 (2002) (in order to impeach a police officer with prior allegations of misconduct, the alleged misconduct must relate to the defendant's case)). Moreover, "[m]ere allegations of misconduct, without evidence the officer was disciplined, are not admissible as impeachment [citations] and do not raise an inference of bias or motive to testify falsely." *Porter-Boens*, 2013 IL App (1st) 111074, ¶ 20; see also *People v. Evans*, 373 Ill. App. 3d 948, 957 (2007) (proof of arrests, indictments and other unproven charges are not admissible to attack a witness's character).

¶ 67        According to the record, the trial court received, posttrial and pursuant to defense subpoena, 19 OPS files regarding O'Shaughnessy and 15 OPS files regarding Rigan. The trial court examined each OPS file *in camera* and thereafter conducted a hearing at which defendant was permitted to argue. Concerning O'Shaughnessy, 16 of his 19 OPS files occurred between 2002 and 2006. The trial court found that those 16 files were too remote in time and contained allegations that were wholly unrelated to defendant's allegations of

- 15 -

misconduct pursuant to his trial testimony. The 3 remaining files, which pertained to matters between 2008 and 2010, did not contain any similar allegations of misconduct.

¶ 68 Concerning Rigan, 9 of his 15 OPS files occurred between 2002 and 2006. The trial court found that those 9 files were too remote and not similar to defendant's allegations of misconduct in this case to establish any kind of pattern of misconduct. The 6 remaining files, which pertained to matters between 2008 and 2010, did not contain any similar allegations that would establish a pattern of abuse.

¶ 69 The trial court noted that in every OPS file reviewed for O'Shaughnessy and Rigan the allegations were either deemed unfounded or not sustained or the officers were exonerated. The court concluded that none of the OPS files met the requirements for admissibility and, therefore, it would not have tendered any of the OPS files to defendant had they been received prior to trial. The trial court sealed and impounded the files in the event of appellate review.

¶ 70 After conducting our own review of the materials the trial court reviewed, we find the trial court did not abuse its discretion in finding the files were not discoverable or admissible. The trial court used the proper review procedure and did not err in its decision as to the remoteness and irrelevancy of the information in the OPS files. Regarding the nine files of both officers that were not too remote in time, the allegations of misconduct were completely distinct from anything that happened in this case, and the police authorities found all the claims against the officers were either unfounded or not sustained by sufficient evidence. Moreover, our review of the nature of the complaints does not reveal a series of similar incidents spanning several years. Therefore, the trial court properly found that the OPS files were not admissible and, thus, not subject to disclosure. Based upon our conclusion, we need not address defendant's arguments concerning *Brady* or discovery violations (*Brady v. Maryland*, 373 U.S. 83 (1963)).

¶ 71                                     III. CONCLUSION

¶ 72 For the foregoing reasons, in case No. 1-13-0135, we reverse the judgment of the circuit court of Cook County and remand the case for further proceedings consistent with this order. In case No. 1-13-3166, we dismiss defendant's appeal of the denial of his postconviction petition as moot.

¶ 73 No. 1-13-0135, Reversed and remanded.

¶ 74 No. 1-13-3166, Appeal dismissed.