NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 230632-U

NO. 4-23-0632

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 29, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Tazewell County |
| SHAYANNE EMMONS, | ) | No. 22DV161 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Paul E. Bauer, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Harris and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court reversed defendant's conviction for domestic battery and remanded for a new trial because the trial court committed first-prong plain error by failing to instruct the jury of the State's burden of disproving defendant's affirmative defense of self-defense where the evidence was closely balanced.

¶ 2    A Tazewell County jury found defendant, Shayanne Emmons, guilty of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2020)), and the trial court sentenced her to 24 months' probation. Defendant appeals her conviction, arguing that: (1) the court did not properly instruct the jury on the State's burden to disprove her claim that she acted in self-defense, (2) the court erred by excluding evidence of the alleged victim's violent crimes, (3) the alleged victim improperly communicated with jurors during a recess, compromising defendant's right to an impartial jury, and (4) the court wrongly allowed the State to shift the evidentiary burden to defendant and to introduce improper opinion evidence and hearsay. The State admits numerous

errors but contends that none of the errors were so serious as to require a new trial. We find that the improper jury instructions constituted plain error, so we reverse defendant's conviction and remand for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4            In December 2022, defendant and her then-boyfriend, Dalton Highley, were alone together at defendant's apartment in Pekin, Illinois. They had a heated argument that turned violent, although the details were highly contested. Pekin police officers arrested defendant, and the State charged her with domestic battery.

¶ 5            Before defendant's trial, the State filed a motion *in limine* to bar evidence of her order of protection against Highley, which she obtained based on events that occurred after the December 2022 incident. The State also asked to exclude evidence of Highley's 2023 convictions for unlawful restraint and domestic battery of defendant, as well as his 2021 conviction for battery. Defendant argued that these crimes showed that Highley was more likely to have been the aggressor in the December 2022 incident. Initially, the trial court ruled that the 2023 events were inadmissible. It eventually excluded all evidence of Highley's convictions.

¶ 6            During the jury trial, Officer Joshua Eaton of the Pekin Police Department testified that one night in December 2022, he responded to a report of a woman who was possibly suicidal. The caller said that he was concerned about the woman's well-being and followed her to a cul-de-sac, where he blocked her exit. Eaton was the first officer on the scene, and he spoke to defendant first. She told him that she went for a drive because she needed to get away from Highley, but he followed her. She did not say anything about being hit or attacked. Officer Eaton testified that he did not see any marks on her. Body camera video from this interaction was admitted into evidence.

- 2 -

¶ 7          Officer Eaton also spoke to Highley. Highley said that he and defendant had argued and she hit or slapped him about 30 times and threw a crossbow at him. He admitted that he restrained her and followed her, but he did not say that he hit her. Officer Eaton later testified that he saw Highley's marks and they were consistent with him being punched or slapped in the face.

¶ 8          Officer Eaton arrested defendant for domestic battery. He testified that after he arrested her, she "changed her story." She acknowledged a physical altercation took place but claimed that she was the victim. She said that she had bruises. Officer Eaton testified that he did not see any bruises, although she was wearing a sweatshirt that covered much of her body. She had a small box cutter in her sweatshirt pocket. Initially, she did not admit to cutting herself, but she eventually acknowledged doing so. Body camera video of the arrest and conversation was admitted into evidence.

¶ 9          An ambulance arrived, and Officer Eaton accompanied defendant to a hospital in the ambulance. He recorded more body camera video, which was admitted as evidence. In the ambulance, defendant told Eaton that she was physically harmed. After the video was played in court, Officer Eaton testified that he just saw in one of the videos that he had mentioned seeing marks on defendant, but he did not remember where. At the hospital, Officer Eaton spoke to defendant one more time. Defendant told Officer Eaton that Highley had grabbed her by the throat and dragged her out of bed onto the floor. Officer Eaton saw no marks to support this. He observed a bruise on her hand, near the location of her intravenous line (IV). Officer Eaton testified that he may have seen this bruise before the hospital staff administered the IV, but at the time of trial, he did not remember. He said that defendant consistently refused to show him any other marks. She claimed that she may have had other marks, but she did not see any at the time. Officer Eaton

advised her to tell him if she found any, but she never did. Body camera video of this conversation was admitted as evidence.

¶ 10     During his testimony, Officer Eaton explained that earlier that same night, a few hours before he had responded to this call at the cul-de-sac, he had responded to a call at defendant's apartment. The caller claimed that someone else was holding a knife to their own throat, and the caller asked what to do in that circumstance. Officer Eaton went to the apartment and spoke to Highley and defendant. Neither appeared to him to be in distress. They denied that either held a knife to his or her throat. Instead, they told Officer Eaton that the knife remark was just a comment someone made while playing video games.

¶ 11     Another Pekin police officer, Cody Vicary, also testified that on that December 2022 night, he responded to a report of a man pursuing a potentially suicidal woman. He spoke to Highley, who said that defendant, his girlfriend, had been harming herself, and he tried to stop her. Highley told Officer Vicary that she had hit him and threw a crossbow at him. Highley also told him that she fled the apartment, he followed because he was worried she would hurt herself, and he blocked her into the cul-de-sac to prevent her from leaving. Officer Vicary saw red marks on Highley's face, which he believed were consistent with Highley being punched or slapped. Officer Vicary also saw a mark on Highley's torso, which Highley said resulted from defendant throwing a small handheld crossbow at him. Highley's left arm had bruising, allegedly from the crossbow. Officer Vicary photographed the marks on Highley's body and recorded part of his conversation with Highley on his body camera. The photographs and body camera video were admitted into evidence. Officer Vicary testified that after speaking with Highley, he believed that defendant caused his injuries.

¶ 12        Highley then took the stand and told the jury his version of what happened at the apartment that night. According to Highley, he and defendant argued in the evening. He wanted to go fishing with a friend, but she did not want him to go. He testified that they played video games, everything was fine, and then they went to sleep. When asked directly, Highley acknowledged that police had come to the apartment earlier in the evening because someone had called about a knife. He testified that the police arrived but they "just assumed it was somebody on the game that said something and somebody overheard the mike and then—yeah."

¶ 13        Highley explained that when he awoke later that night, defendant was not in the bed. He found her in the living room going through his phone. He got his phone from her, and she started yelling at him. Highley said that at this point, defendant slapped him a few times. He denied putting his hands on her first. When asked, "In the past, have you ever put your hands on her?" he replied, "No." He explained that at some point they went into the bedroom and continued to argue. She continuously slapped him, "open-hand punching" him in the face. She threw a small handheld crossbow at him. She picked up her keys, saying that she was going to drive off a cliff. He put his arms and legs around her, attempting to restrain her and prevent her from hitting him.

¶ 14        Highley told the jury that after defendant left, he followed her because he was worried she would drive into the river. He knew she had a box cutter, and he was worried about her safety, so he called the police. He was on the phone with the police the entire time he pursued her. Defendant turned down a cul-de-sac, and he blocked her there. Police officers arrived about two or three minutes later, and Highley told them about the argument and defendant hitting him, and he showed them the marks that she had caused. He testified that he did not choke defendant or slam her to the ground. When asked, "Have you ever previously hit her before?" he testified "no."

¶ 15        Defense counsel cross-examined Highley regarding some text messages he had sent defendant around November of 2022. Highley had texted her: "I promise on my grandma's grave I'll never put my hands on you again." Highley explained that this referred to "[w]hen [he] restrained her." He said, "I've had to restrain her before" from "putting her hands on me." He admitted that he had previously texted her that he wanted to take a bunch of pills. When defense counsel asked if he had texted her "I'm sorry. I'm never going to hurt you again," he explained that there are different kinds of hurt. He later explained that this referred to yelling and screaming.

¶ 16        The State rested, and after a brief recess, defense counsel told the trial court that some relatives of defendant saw Highley speaking with some of the jurors during the break. Outside the presence of the jury, two of defendant's relatives told the court that they saw Highley speaking with two of the jurors outside of the courthouse, although they did not hear what Highley or the jurors said. The State's attorney reported that Highley admitted asking someone how long their longest jury trial was. Defendant's attorney moved for a mistrial. The judge indicated that he told the jury to bring this to his attention. The judge reserved ruling on defendant's motion and waited to see if the jurors reported any conversations with the witness.

¶ 17        The testimony resumed, and defendant told the jury her version of what happened at her apartment. She testified that when she awoke on that December night, Highley was agitated. He was huffing and puffing, making exaggerated movements, and slamming his phone down, but he refused to tell her why he was upset. She saw that Highley had posted about an ex-girlfriend on a social media account. She asked him about it, and they began to argue. He wanted to see her phone and demanded that she give it to him. At some point, he tried to grab the phone and hit the phone into defendant's lip. She hid her phone under her body. Defendant testified that Highley got on top of her and began choking her. Her head began hurting from the pressure, so she stopped

resisting. He took her phone, threw it, got off her, and then told her to go get the phone. She got it and told him to leave, but he refused. Defense counsel asked defendant why she had not left. She responded that Highley would not allow it. When she tried to push past him into another room, he followed her and grabbed her. Defendant testified that she went back to bed, but Highley started groping her. She repeatedly told him to stop and pushed him away. She tried to go into another room, but he followed, demanding sex. She went back to the bedroom and lay down, trying to ignore him, but he persisted. Eventually, she asked him: "[W]ill f***ing me magically make everything better?"

¶ 18       Defendant testified that at this point, Highley's demeanor drastically changed. He said, "[Y]ou know what, yeah it will." He got off the bed, grabbed her ankles, and pulled her down. The back of her head struck the bed. She testified that this part of her head was covered with hair. She tried to curl up, and her face hit a side table as she was falling. He dropped her on her head, and then the rest of her body fell. After he dropped her, she began crying and told him to leave. At first, he tried to console her, but then he became angry that she would not have sex with him, saying that he might as well kill himself. He walked into the kitchen. She followed and saw him holding a large kitchen knife to his throat. He said that he should just end it. He mimed cutting his throat, and he was banging and slamming things.

¶ 19       Defendant told the jury that she called the police because Highley had a knife to his throat. She asked the operator what to do if someone had a knife to their throat. Highley was telling defendant that he would kill himself or take the officer's gun. As defendant talked to the operator, Highley's demeanor changed, and he appeared to calm down. She told the operator that they were okay. But the operator said that they could hear everything in the background and the police were already on their way.

¶ 20        Defendant testified that a police officer knocked on the door. Highley was very angry. Defendant had marks on her arms, so he told her to cover up. She put a sweatshirt on. Highley went to the bathroom while she answered the door and told the officers that they did not need them. The officers asked to talk to Highley. He came out and said nothing had happened, so the officers left. Highley went to bed, and he asked defendant to lie next to him. As they were lying in bed, Highley moved his arm in his sleep. This made defendant jump out of bed. She realized that she did not feel safe in her own bed, so she moved to the couch.

¶ 21        Defendant testified that soon after she moved to the couch, Highley woke up. He yelled and screamed at her. She told him he could leave, but he refused. He grabbed her legs and jerked her around. She tried to go to bed, hoping that would be enough to calm him, but he started groping her again. She repeatedly told him to stop. He kept grabbing and pressing up against her, so she got out of bed. At this point in her testimony, defendant refreshed her recollection with notes she had prepared the day before. She then resumed her description, saying that she had tried to go to the kitchen and bathroom and then returned to the bedroom. Highley became upset again, tried to grope her, and made comments like "why don't you f*** me" and "I'm just gonna kill myself."

¶ 22        Defendant told the jury that Highley got on top of her and said, "[H]it me, I deserve it." He started hitting himself in the face, saying, "[I]t doesn't hurt, I deserve it." He grabbed her hand and tried to make her hit him. She pulled back from him, and this hurt her and bruised her hand. She pushed him off her. She decided to leave, so she went to the closet to get sweatpants. She tripped over her hand crossbow and then picked it up. Highley had come behind her and blocked her way, asking, "[W]here do you think you're going." She said she was going to the river to get away from him. She pushed him, with the crossbow in her hand. After she got past him, she

dropped the crossbow on the ground. She denied ever throwing the crossbow. She began putting on sweatpants, but he pushed his body against hers and tried to grab her breasts. She pushed his face to get him off her, grabbed her bag, and ran out of the apartment.

¶ 23 Defendant then described her conversations with the police officer. She acknowledged that when she spoke to the police, she did not initially say that she was hurt. She told the police that she had been trapped in her apartment and was trying to get away from Highley. She admitted to the jury that she had a box cutter with her that night, she told the officer that she had cut herself, and she had made suicidal comments. She said that she did not tell police what had happened because she was "terrified." She testified that, as she understood Illinois domestic violence law, even if a victim does not want to press charges, the abuser must be arrested. Defendant believed that if she reported Highley's abuse to the police and he was arrested, he would get out of jail in a couple of days. She knew that Highley had a key to her apartment and ties to her family. She also said that he could blackmail her if she tried to have him arrested. She testified that he once recorded them having sex without her knowledge. She explained that the night of her arrest, she made suicidal statements because she felt helpless and trapped. She testified that she had bruises on her forearms from where Highley tried to restrain her and on her hand.

¶ 24 On cross-examination, defendant admitted that she never showed those bruises to police officers, she initially told police that nothing physical happened that night, and she did not tell them about her being sexually harassed. She testified that later in the night, she did have a mark on her throat from where Highley had choked her. She also had a small scratch on her face from where she hit the table, although she did not show the officer. She explained that when she spoke to the officer, she did not know that she had the scratch because she had not yet had the

opportunity to examine her injuries. She also testified that she cut herself with the box cutter right before she left, while Highley was groping her.

¶ 25        Highley was called back to the stand to testify again. He said that defendant was not telling the truth. He denied blackmailing her, blocking her in a closet or bedroom, groping her without her permission, dragging her on the floor, hitting the back of her head, punching or slapping himself, or putting a knife to his throat. He testified that he did not feel safe that night, but he stayed with her because he was too worried for her and because he cares more about other people than he cares about himself.

¶ 26        In its closing argument, the State addressed defendant's claim of self-defense. The State's attorney said that "we have the burden of disproving that, and I'm confident that we have proved that today." He emphasized that if defendant really had all the marks she claimed to, she would have told the officers. He emphasized that none of the evidence, including the police body camera video, supported defendant's alleged injuries. He also stated that "when someone raises self-defense, it's my job as the State to disprove that beyond a reasonable doubt." Defense counsel told the jury, "You don't need proof that she defended herself. All you need is a reasonable doubt that she unjustifiably struck him." The State replied,

> "[T]heir whole claim of self-defense is out the window, and we have proved that beyond reasonable doubt, and we have also proved today beyond reasonable doubt that she caused bodily harm to him even if it was just a little redness on his face, those few marks. That's all that matters, and because of that, you must find the Defendant guilty of domestic battery."

¶ 27        The trial court instructed the jury on the definition of domestic battery and self-defense. The instructions stated a "person commits the offense of domestic battery when he

knowingly and by any means makes physical contact of an insulting or provoking nature with any family or household member." The instructions included the following:

"To sustain the charge of domestic battery, the State must prove the following propositions:

*First Proposition:* That the defendant knowingly caused bodily harm to Dalton Highley; and

*Second Proposition*: That Dalton Highley was then a family or household member to the defendant.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond reasonable doubt, you should find the defendant not guilty."

The instructions also stated "a person is justified in the use of force when and to the extent that [person] reasonably believes that such conduct is necessary to defend herself against the imminent use of unlawful force."

¶ 28       The jury found defendant guilty of domestic battery. The trial court indicated that no jurors reported any conversations with Highley, so the court denied defendant's motion for mistrial. The court sentenced defendant to 24 months' probation.

¶ 29       This appeal followed.

¶ 30                                  II. ANALYSIS

¶ 31    On appeal, defendant argues that: (1) defendant was denied a fair trial because the jury did not receive proper instructions regarding the State's burden to disprove defendant's claim of self-defense, or her trial attorney was ineffective for failing to provide the correct instructions; (2) the trial court erred by excluding Highley's prior conviction for battery and his convictions, subsequent to the December 2022 incident but before this trial, of unlawful restraint and domestic battery of defendant; (3) defendant was denied her right to an impartial jury because Highley communicated with jurors during a recess; and (4) the court wrongly allowed the State to shift the evidentiary burden to defendant and to introduce evidence of Highley's prior consistent statements, police officer opinion testimony, and Highley's opinion on defendant's credibility.

¶ 32    We find defendant's jury instruction argument dispositive, so we limit our analysis to this issue. Defendant's attorney did not preserve this issue by raising a timely objection at trial, so we review for plain error. Illinois Supreme Court Rule 451 (eff. Apr. 8, 2013) governs the use of Illinois Pattern Jury Instructions, and subsection (c) states "substantial defects are not waived by failure to make timely objections thereto if the interests of justice require." This rule permits correction of grave errors and errors in cases so factually close that fundamental fairness requires that the jury be properly instructed. *People v. Sargent*, 239 Ill. 2d 166, 189 (2010). It is coextensive with the plain-error clause of Illinois Supreme Court Rule 651(a) (eff. July 1, 2017). *Sargent*, 239 Ill. 2d at 189. When reviewing for plain error, we ask if either

> "(1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Cacini*, 2015 IL App (1st) 130135, ¶ 42, (citing *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

¶ 33        The first step in plain-error review is to "determine whether a 'clear or obvious' error occurred at all." *People v. McLaurin*, 235 Ill. 2d 478, 489 (2009). We review whether jury instructions accurately conveyed the law *de novo*. *People v. Getter*, 2015 IL App (1st) 121307, ¶ 36. "We must determine whether the instructions, taken as a whole, fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *People v. Parker*, 223 Ill. 2d 494, 501 (2006).

¶ 34        The United States and Illinois Constitutions protect "a defendant from conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Green*, 225 Ill. 2d 612, 622 (2007) (citing *In re Winship*, 397 U.S. 358, 364 (1970)); see U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. "Consequently, to ensure a fair trial, the trial court must instruct the jury on such basic matters as the elements of the offense, the presumption of innocence, and the burden of proof." *Green*, 225 Ill. 2d at 622. When a defendant claims that she acted in self-defense, the State bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *People v. Lee,* 213 Ill. 2d 218, 224 (2004). The jury must be instructed as to this defense and the State's corresponding burden of proof. See *Green,* 225 Ill. 2d at 622.

¶ 35        Under Rule 451(a), Illinois trial courts must use the Illinois Pattern Jury Instructions, Criminal, when they apply in a criminal case. Illinois Pattern Jury Instruction, Criminal, No. 24-25.06 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 24-25.06) provides the general instruction for self-defense. It instructs the jury that a "person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend *[(himself) (another)]* against the imminent use of unlawful force." The Committee Notes to this instruction also require the court to give IPI Criminal 4th No. 24-25.06A, which provides that the

State must prove the following proposition beyond a reasonable doubt: "[t]hat the defendant was not justified in using the force which he used." IPI Criminal 4th No. 24-25.06A; see IPI Criminal 4th No. 11.12. Additionally, IPI Criminal 4th No. 11.11 provides the definition of domestic battery. It states that "A person commits the offense of domestic battery when he *[(intentionally) (knowingly)]* [without legal justification] and by any means *[(causes bodily harm to) (makes physical contact of an insulting or provoking nature with)]* any family or household member." The Committee Notes require the court to give IPI Criminal 4th No. 11.12 and to include the phrase "without legal justification" when a defendant argues that she acted in self-defense.

¶ 36        Defendant claims that the trial court did not instruct the jury according to these rules. The State concedes the court did not properly instruct the jury, and we agree. IPI Criminal 4th No. 11.12 lists the propositions that the State must prove beyond a reasonable doubt to convict a defendant of domestic battery. IPI Criminal 4th No. 24-25.06A requires that when the defendant claims self-defense, those propositions must include that "the defendant was not justified in using the force which he used." The jurors did not receive that instruction here. Likewise, based on the Committee Notes to IPI Criminal 4th No. 11.11, the trial court should have instructed the jury that a "person commits the offense of domestic battery when he knowingly *without legal justification* and by any means makes physical contact of an insulting or provoking nature with any family or household member." (Emphasis added). But here, the trial court omitted the phrase "without legal justification." These two omissions were clearly errors. See *People v. Serotzke*, 2023 IL App (4th) 220304-U, ¶¶ 45-46, 48 (finding that a trial court erred by omitting the same instructions omitted here); *Cacini*, 2015 IL App (1st) 130135, ¶¶ 51-52.

¶ 37        Although the State concedes that the trial court erred by omitting these instructions, it asks that we uphold defendant's conviction on the basis that this error was not serious enough to

warrant a new trial. Because this error was not preserved, we will reverse defendant's conviction if,

> "either (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Cacini*, 2015 IL App (1st) 130135, ¶ 42 (citing *Piatkowski*, 225 Ill. 2d at 565).

¶ 38 Because we find that the evidence here was so closely balanced that the erroneous jury instruction had a potentially dispositive effect on the trial, we address only the first prong of plain error. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. "A reviewing court's inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id*. See *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 71.

¶ 39 The State charged defendant with domestic battery, and she claimed as an affirmative defense that she acted in self-defense. As noted above, the State bore the burden of disproving this defense beyond a reasonable doubt. Therefore, the key question was whether defendant reasonably believed that her conduct was necessary to defend herself against the imminent use of unlawful force. See IPI Criminal 4th No. 24-25.06.

¶ 40 Here, all the evidence confirms that a violent altercation took place at defendant's apartment that night. But the only two witnesses to the conflict were defendant and Highley, and their accounts were highly divergent. Both claimed to have suffered violent abuse initiated by the

other. No bystander observed what transpired. No photographs or camera video recorded the altercation as it took place. No physical evidence was collected from the apartment. The jury could not decide the case without relying on the testimony of either defendant or Highley, and they could not reach a guilty verdict without deciding that Highley's testimony was more credible than defendant's.

¶ 41 The State insists that defendant's account was implausible and unworthy of belief, so the evidence was not "closely balanced." In particular, the State argues that defendant's story cannot be true because it does not explain the marks on Highley's face and body. According to the State, defendant said that she made physical contact with Highley only once when she pushed him away, whereas in Highley's account, defendant hit his face around 30 times. The State also argues that the testimony and observations of Officers Vicary and Eaton reinforced Highley's narrative.

¶ 42 We disagree with the State's characterization of the record. Defendant testified to an extended violent encounter that lasted multiple hours. In her telling, Highley repeatedly grabbed her, and she repeatedly pushed him away. He blocked her from leaving rooms, and she tried to push past him many times, including once with a crossbow. According to defendant, Highley hit himself in the face multiple times and grabbed her hand to make her hit him. Although the police officers believed that Highley's marks were consistent with him being slapped or punched, they did not witness the fight, so their testimony does not establish whether Highley or defendant was the aggressor or who caused the marks. Both defendant's and Highley's accounts could explain the marks on Highley's face and torso.

¶ 43 The State also argues that defendant's account was implausible because she initially lied to Officer Eaton, saying that no physical altercation took place. She changed her story only

after the officer arrested her. Even then, she did not show Officer Eaton the purported marks that she later claimed were there.

¶ 44 Defendant's testimony explained all of this as well. She described her fear that if she reported any violence to the police, Highley would retaliate. She explained that she was afraid because he had a key to her apartment and knew her family. She also feared that he would use a video of them having sex, which she claimed he recorded without her consent, against her. Regarding the marks on her body, defendant testified that her arms were covered by a sweatshirt and her hair covered any mark on her head. She also said that when she talked to the officer, she had not yet assessed her injuries. Even if the jury did not believe defendant's explanation, her account was at least plausible, and it certainly was not "fanciful." See *Sebby*, 2017 IL 119445, ¶ 61.

¶ 45 Moreover, evidence was admitted that challenged Highley's credibility as well. During his testimony, he was asked, "In the past, have you ever put your hands on her?" and he responded, "No." But later, on cross-examination, he admitted that he had texted defendant, "I promise on my grandma's grave I'll never put my hands on you again." He also had previously texted her, "I'm sorry. I'm never going to hurt you again." He explained that these messages meant that he had previously needed to restrain defendant to prevent her from "putting hands" on him and that there are different ways of hurting someone. Perhaps the jury accepted his explanation, but doing so required them to assess his credibility and defendant's based on little else but each witness's own testimony.

¶ 46 This case closely resembles *Sebby*. There, a jury had found the defendant guilty of resisting a peace officer. The trial court gave erroneous jury instructions, and on appeal the Illinois Supreme Court considered whether the evidence was so closely balanced that the court should

reverse under the first prong of plain-error review. *Sebby*, 2017 IL 119445, ¶ 1. At trial, three sheriff's deputies each testified that as they were executing a court order, the defendant aggressively poked one of them, pulled away from a deputy's grasp, and thrashed around. The deputies testified that two of them tried to restrain the defendant outside his house, while the defendant resisted. They said that the scuffle caused scratches on one deputy's hands, and photographs of the scratches were introduced into evidence. *Id*. ¶¶ 55, 56, 59. To rebut these allegations, the defendant and two of his relatives testified that the defendant did not resist at all. Instead, they claimed that two officers arrested the defendant without provocation and they struggled in the gravel because two deputies were both trying to handcuff him at the same time without coordination. *Id.* ¶¶ 57, 58. The supreme court reviewed all the trial evidence and determined that it was closely balanced because the outcome of the case "turned on how the finder of fact resolved a 'contest of credibility.' " *Id*. ¶ 63 (citing *People v. Naylor*, 229 Ill. 2d 606-07 (2008)). Although the State introduced evidence of the sheriff's deputy's hand injuries, these photographs "only corroborated the existence of his injuries, not their cause." *Sebby*, 2017 IL 119445, ¶ 59. Because both versions of the incident were credible, and no extrinsic evidence corroborated or contradicted either account, the evidence was closely balanced. *Id*. ¶ 63.

¶ 47      Similar reasoning applies here. Both the State and defense presented one witness to the conflict, and each witness gave a different account. The State introduced photographs of Highley's injuries, but defendant's story accounted for those injuries, and these photographs "only corroborated the existence of his injuries, not their cause." *Id*. ¶ 59. Although defendant admitted that she initially denied any abuse had occurred and later changed her story, evidence was admitted to question Highley's credibility as well. Just as in *Sebby*, defendant's description of the incident was plausible, and there was no extrinsic evidence to corroborate or contradict either account, so

the evidence was closely balanced. *Id*. at ¶ 63. Therefore, just as in *Sebby*, the trial court's omission of the required jury instructions constituted first-prong plain error, entitling defendant to a new trial.

¶ 48                                    III. CONCLUSION

¶ 49          For the reasons stated, we reverse defendant's conviction and remand for a new trial.

¶ 50          Reversed and remanded.