NOTICE

Decision filed 02/06/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240087-U

NO. 5-24-0087

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 21-CF-452 |
| | ) | |
| COMMODORE JACKSON, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Moore and Boie concurred in the judgment.*

**ORDER**

¶ 1    *Held*:  (1) We reject the defendant's confrontation clause, hearsay, and character-evidence claims where he has failed to establish plain error. (2) Viewing the evidence in the light most favorable to the State, a rational trier of fact could find beyond a reasonable doubt that the defendant possessed a knife and caused great bodily harm. (3) The defendant's claim of ineffective assistance of counsel fails because he did not demonstrate a reasonable probability that the result of the proceeding would have been different absent counsel's alleged errors.

¶ 2    Following a bench trial, the defendant, Commodore Jackson, was found guilty of five counts of aggravated battery (counts I-V) (720 ILCS 5/12-3.05(f)(1), (a)(1) (West 2020)) and one count of unlawful possession of weapons by a felon (UUWF) (count VI) (*id.* § 24-1.1(a)). The trial court merged counts I-IV with count V in accordance with the State's recommendation at the

_____

*Justice Moore fully participated in the decision prior to his retirement. See *Cirro Wrecking Co. v. Roppolo*, 153 Ill. 2d 6 (1992).

1

sentencing hearing. The trial court sentenced the defendant to consecutive terms of 5 years' imprisonment for aggravated battery causing great bodily harm (count V) and 12 years' imprisonment for unlawful possession of weapons by a felon (count VI). This direct appeal follows.

¶ 3    On appeal, the defendant raises three main issues. First, he alleges his constitutional right to confront witnesses was violated when the trial court allowed the State to elicit statements made by Justice Garnon, a nontestifying witness, and the statements were inadmissible hearsay. Second, the defendant challenges the sufficiency of the evidence regarding whether he was in possession of a knife and caused "great bodily harm" to the victim. Lastly, the defendant argues that his trial counsel was ineffective for failing to object to the admission of Justice Garnon's hearsay statements.

¶ 4                                I. BACKGROUND

¶ 5    On November 5, 2021, the defendant was charged, by information, with two counts of aggravated battery and one count of unlawful possession of weapons by a felon. On November 30, 2021, a preliminary hearing was held, and probable cause was found in the defendant's case. On December 3, 2021, the State filed a first amended information alleging the same offenses but altering which counts the State was seeking an enhanced Class X sentencing range. On February 7, 2022, the defendant filed a signed waiver of his right to a jury trial and requested a bench trial. Thereafter, on February 28, 2022, the State filed a second amended information, which no longer sought Class X sentencing against the defendant.

¶ 6    The second amended information consisted of six counts. Count I charged the defendant with aggravated battery and alleged that on or about November 5, 2021, the defendant, while using a deadly weapon, a knife, committed a battery in violation of section 12-3 of Act 5 of Chapter 720

2

of the Illinois Compiled Statutes (720 ILCS 5/12-3.05(f)(1) (West 2020)), in that the defendant knowingly stabbed Torrion Creer in the left thigh. Count II charged the same offense but alleged a separate stab wound to Creer's left back. Count III alleged the same but a separate stab wound to Creer's left shoulder. Count IV alleged the same but alleged a laceration to Creer's right forehead. Count V also alleged aggravated battery in that the defendant, knowingly and without legal justification, caused great bodily harm to Creer, in that the defendant stabbed Creer with a knife. Count VI charged the defendant with unlawful possession of weapons by a felon and alleged the defendant, a person previously convicted of a felony under the laws of the State of Illinois, knowingly and unlawfully possessed a knife with the intent it be used unlawfully against another, having previously been convicted of unlawful possession of a weapon by a felon in Cook County case No. 17CF1223501.

¶ 7     On March 4, 2022, the defendant proceeded to a bench trial. The State called 10 witnesses to testify. Blake Bledsoe was the first witness to testify and stated that he was the entertainment director at Hangar 9 bar in Carbondale, Illinois, and that part of his responsibilities included reviewing surveillance recordings. He stated that Hangar 9 had approximately 9 to 15 motion-activated surveillance cameras covering the bar's interior and exterior. Through Bledsoe, the State introduced People's exhibit No. 2, a surveillance recording of the south entrance of Hangar 9 on November 5, 2021, from approximately 1:13 a.m. to 1:14 a.m., which was played for the court. The recording showed the defendant wearing a white sweatshirt with red and black writing and/or design, a white bucket hat, and black pants. The defendant exited the bar first and walked around the corner of the building, followed shortly by Creer, who was shirtless. The video depicts the defendant lunging out toward Creer, Creer raising his hands, and the defendant swinging his right arm while fully extended toward Creer and making contact with the left side of Creer's back. The

video then depicts Creer circling away from the defendant while the defendant chased him until both move out of the camera's view. On cross-examination, Bledsoe testified that when police requested to review the cameras on the night of the incident, he was unable to locate any video of use; however, the next morning, another employee located this video on Hangar 9 bar's surveillance system. Further, he testified that he was not sure how long a video would remain on the system before it was automatically "purged."

¶ 8    Beau Nance, a deputy with the Jackson County Sheriff's Department, testified he was a crime scene investigator for the sheriff's department, and one of his duties was retrieving recorded phone calls from the jail. Nance testified he retrieved the defendant's recorded jail calls between November 5 and December 1, 2021. The State entered these recorded jail calls into evidence as People's exhibit No. 1.

¶ 9    Sergeant Tyler Pingolt of the Carbondale Police Department testified that he had been employed at the Carbondale Police Department for 12 years. On November 5, 2021, at approximately 1 a.m., he was dispatched to Hangar 9 bar, located at 511 South Illinois Avenue, in reference to an individual who had been stabbed and was bleeding. He testified he was second to arrive on scene after Officer Arenas. He observed an individual lying to the east of the entrance of Hangar 9 bleeding profusely. He identified the individual as Torrion Creer and observed him bleeding from multiple areas on his body. He testified that Creer was transported to the hospital for his injuries. Sergeant Pingolt testified that while he was processing the crime scene, he was approached by a female, Justice Garnon. He testified that Garnon was a witness to the incident and provided him with information that guided the next steps of his investigation. Additionally, Garnon identified the suspect in the stabbing as the defendant. The following exchange then took place:

"Q. All right, and what did she tell you about Commodore Jackson?

4

A. She had known him for approximately a month, but she was starting to separate herself from him due to his aggressive behavior. I believe she even noted—

MR. MOYER [(DEFENSE ATTORNEY)]: Objection, hearsay.

MR. SUTHARD [(ASSISTANT STATE'S ATTORNEY)]: Judge, I am not offering this for the truth of the matter asserted. I am offering it to show that the next steps of what the Carbondale Police Department did. It is admissible, Your Honor, under the course of the police investigation, which is an exception to the hearsay rule. Again, I am not offering this aspect of whether or not she actually dated Commodore Jackson or not. This is just offered to show what she told the officers that steered the investigation for that limited purpose.

THE COURT: Okay. For that limited purpose and that specific question, the objection is overruled, but beyond that, we'll revisit it if you make another objection.

[ASSISTANT STATE'S ATTORNEY]: Thank you. You can continue.

A. Okay, so she had ended up saying that she was trying to distance herself due to his aggressive behavior. He was calling her multiple times and almost lead [*sic*] to stalking her as well."

Sergeant Pingolt testified that Garnon texted photographs of the defendant's Social Security card and Illinois legal I.D. card to his work phone. Those photographs were admitted into evidence without objection as People's exhibit Nos. 4 and 5. He further testified that the defendant left the scene in a white Lincoln SUV. He also testified that he attempted to locate video of the incident from Hangar 9 with an employee but was unsuccessful at the time. He and Officer Arenas returned to the police station to review the city of Carbondale's video surveillance system in an attempt to locate video relevant to the incident.

¶ 10     Officer Jonathan Arenas of the Carbondale Police Department testified next. On November 5, 2021, at approximately 1 a.m., he was dispatched to Hangar 9 bar in relation to a stabbing. He was the first officer to arrive and observed the victim, Torrion Creer, lying on the ground and bleeding heavily from multiple lacerations, prompting him to request medical assistance and report that a stabbing had occurred. He testified that based on his training and experience and observation of Creer's injuries, he "immediately knew [Creer] had been slashed or stabbed by a sharp object." Officer Arenas documented the scene by photographing areas where Creer had been located, including what he described as a pool of blood, and those photographs were admitted into

evidence. Officer Arenas later assisted Sergeant Pingolt in reviewing the city of Carbondale's surveillance system, which continuously records various city locations, including an area behind Hangar 9. He testified that the system was functioning properly, that he was trained in its use, and that the video recordings he retrieved were a fair and accurate depiction of the events recorded. The video, admitted as People's exhibit No. 3, was played for the trial court. The video depicts the entire incident from a distance and shows the three individuals identified by Officer Arenas as Creer, Garnon, and the defendant. The defendant is seen swiping at Creer, Creer running away from the defendant, the defendant chasing Creer down while continuing to swipe or stab at Creer; Creer falling to the ground, and the defendant continuing to swipe or stab at Creer while he is on the ground. Garnon is seen following Creer and the defendant and attempting to intervene during the attack. The defendant then fled toward the front of Hangar 9 out of view, while Creer lay on the ground bleeding. Garnon followed the defendant as he fled. Officer Arenas testified that on the video, the defendant appeared to place an object into his pocket while fleeing, though Officer Arenas acknowledged that no knife or sharp object was visible on the footage and that no weapon was ever recovered. Based on his training and experience, Officer Arenas opined that Creer's injuries were consistent with being caused by a sharp object. He further testified that Garnon reported the suspect fled in a white Lincoln SUV and that officers later confirmed a white Lincoln was registered to defendant at an address in Murphysboro, Illinois.

¶ 11    On cross-examination, Officer Arenas acknowledged that the suspected blood located on the ground where the victim fell was not scientifically tested. Additionally, he testified that the video did not clearly show the defendant with a knife or sharp object in his hand but based on his experience and the video depicting the defendant using a "swiping motion," he believed there was an object in his hand to cause "that sort of damage."

¶ 12    Officer Anthony Stein testified that he was a Carbondale police officer with more than 13 years of experience and was on duty shortly after 1 a.m. on November 5, 2021, when he responded to a reported stabbing at Hangar 9. Upon arrival, he observed a crowd and the victim, Torrion Creer, bleeding from several areas of his body while Officer Arenas administered first aid. Officer Stein later went to the hospital, where he spoke with Creer in the emergency room; Creer was conscious and able to communicate. Officer Stein observed four to five injuries, which, based on his experience, he believed were stab wounds caused by a knife. Officer Stein photographed the victim's injuries, including a five-to-six-inch laceration to the forehead, stab wounds to the back, shoulder, and hip, and an abrasion to the elbow. Those photographs were admitted and published. Officer Stein also collected and photographed the victim's bloodstained clothing, which was admitted into evidence. On cross-examination, Officer Stein acknowledged that the victim appeared intoxicated and could not recall what the fight was about but remembered that he went outside to fistfight the defendant.

¶ 13    Monique Jones testified next for the State. Jones was the victim's fiancée. She and the victim were at Hangar 9 on November 5, 2021, to celebrate her birthday. She invited a few friends to Hangar 9. One of her friends invited Garnon, but Jones was not friends with her. Jones had seen Garnon and the defendant on one prior occasion at a friend's house. On the night of the attack, Jones described the defendant wearing a white Kangol bucket hat that had a little fur on it. The defendant and Garnon joined Jones and Creer at a table at Hangar 9, and everyone was calm and drinking at first. Later, Jones recalled an argument occurring between the defendant and Creer. She did not recall Creer threatening the defendant in any way. After the argument began, the defendant and Creer went outside. Jones was shown the video from outside the bar, People's exhibit No. 3. She identified the defendant, Creer, and Garnon in the video. She identified Creer

7

because he was shirtless and the defendant by his white bucket hat. On cross-examination, Jones acknowledged she had been drinking alcohol that night. Jones could not recall what the argument was about but recalled holding Creer back so he did not fight the defendant. She did not see the fight between Creer and the defendant outside.

¶ 14 Torrion Creer, the victim, testified that on November 5, 2021, he was at Hangar 9 celebrating his fiancée Monique Jones's birthday with friends and consuming alcohol, and that he was intoxicated that night. Creer stated that he became involved in a verbal confrontation with another male while at a table with the other females inside the bar. He testified he could not identify the male because he was too intoxicated. Creer recalled the male, "acting crazy, like he wanted to fight. I asked him what was his problem." He clarified that the man was sitting across from him at the table, and when he looked up from his phone, the man was looking at him "bug-eyed, weird." Creer asked, "do you have a problem?" The man responded, "yeah, I've got a problem with you. You want to do something about it." Creer replied, "It's up to you. What do you want to do?" The man suggested "taking it outside," which Creer understood as engaging in a fistfight. Creer testified that he did not possess or threaten anyone with a weapon and removed his shirt before going outside to avoid being grabbed during a fight. According to Creer, the other male exited the bar first and briefly disappeared around a corner. When they encountered each other outside, the fight began, and Creer heard a female voice saying, "He is stabbing him." Creer looked at the man's hands and saw a metal blade. He demonstrated to the trial court the way the male was holding his hands, which was consistent with "holding a knife with a blade in an upward motion and doing a stabbing motion." Creer testified that the man chased him while he attempted to flee, he fell to the ground, and the man cut him across the forehead while stating, "You are about to die today." Creer testified he began to bleed heavily and became lightheaded. The State showed Creer

8

People's exhibit No. 3. He identified himself as the shirtless male in the video. He testified the female in the video was a friend of Terica Appiah, who was part of the group at Hangar 9 celebrating Jones's birthday. He testified that the incident caused significant trauma, scarring, and ongoing medical issues, including nerve damage that required additional surgery. On cross-examination, Creer acknowledged gaps in his memory due to intoxication, that he could not identify the assailant, and that he agreed to go outside to fight, but maintained that he did not threaten the assailant with a weapon and recalled seeing a metal blade during the encounter.

¶ 15    Terica Appiah, a friend of Jones, testified that on November 5, 2021, she and Jones picked up Garnon on the way to Hangar 9. Garnon had a bag of clothes with her because she wanted to get away from her boyfriend, the defendant. Appiah had met the defendant once before when he came to her house to buy some food. Appiah and Jones were attempting to start a food business. Jones, Appiah, Garnon, and Creer were together at Hangar 9 celebrating Jones's birthday before the defendant showed up at the bar. Appiah recalled the verbal confrontation between Creer and the defendant began shortly after a "barback" made an inappropriate comment to her at the table. The defendant took offense to it and asked Appiah why she did not stand up for herself. She stated that she did not have someone to stand up for her because she was single, and the other two women were not. Appiah recalled the defendant being agitated and looking around "crazy" while still talking. All three women tried to calm him down, but that is when Creer returned to the table, and they began arguing. Creer and the defendant exchanged words like "what are you looking at" and then they went outside. Appiah and Jones went out the back door to go to the back patio. The defendant, Garnon, and Creer went out the front door. Shortly after, Garnon came to the back patio and said to Jones, "my boyfriend is stabbing your boyfriend." They ran outside and saw Creer

9

bleeding. She recalled the defendant wearing a "white Kangol hat." Appiah recalled that Garnon was trying to get her to go along with her story that night.

¶ 16      Officer Noah Wunderlich of the Murphysboro Police Department testified that he arrested the defendant on November 5, 2021. He was alerted by the Carbondale Police Department that they were looking for the defendant and believed he fled to Murphysboro in a Lincoln MKX. Officer Wunderlich found the defendant lying under some trees south of South 7th Street. The defendant was arrested without incident and appeared to be intoxicated. Officer Wunderlich located the defendant's keys and confirmed that his vehicle matched the description from the Carbondale Police Department. He did not locate a weapon on the defendant or see one in the vehicle.

¶ 17      The State's final witness was Detective Charles Ellett. He worked for the Carbondale Police Department. He obtained a search warrant for the defendant's vehicle, which was secured at a towing facility. During the search, Detective Ellett observed some documents in the vehicle, including proof of ownership, a white bucket hat, a Nike hooded sweatshirt that had some red stains on it, and other clothing. The bucket hat and Nike sweatshirt were entered into evidence as People's exhibit Nos. 10 and 11. Additionally, Ellett testified that he reviewed recorded jail calls contained on a disc admitted as People's exhibit No. 1. He stated that he listened to a call made on November 30, 2021, and recognized one of the voices as the defendant's based on having previously heard him speak in court and at the jail. The call was published to the court. Detective Ellett testified that, although the audio quality was poor, he found it significant that the defendant appeared to instruct the caller to tell Garnon not to call the victim a "snitch," expressing a belief that the victim was not cooperating and indicating concern about the victim testifying. Detective Ellett further testified that, during the call, a female asked the defendant why he was not claiming

10

self-defense, and he responded that it was something to be addressed later, which Detective Ellett understood as a reference to a potential self-defense claim related to the stabbing.

¶ 18    On cross-examination, Detective Ellett acknowledged that he was not a voice-recognition expert, that his interpretation of the call was based on his training and experience, and that no weapon was ever recovered in the case. He also testified regarding his limited role in the investigation, which involved applying for a search warrant for a vehicle. He stated that surveillance video from Hangar 9 had been collected by patrol officers, not by him. Defense counsel read messages that Appiah forwarded to Detective Ellett. The messages were allegedly from Garnon to Appiah. One message read, "you helped me hold back [defendant] and I told you he was going home and trying to get us in the car and he ran up on us." Detective Ellett understood that the "he" she was referring to in the message was probably the victim. On redirect, Detective Ellett testified that Appiah forwarded messages to him in the context of the investigation because she believed she was being pressured to testify favorably for the defendant by portraying the victim as the aggressor.

¶ 19    The State rested, and defense counsel moved for a directed verdict. After hearing arguments, the trial court denied the defendant's motion. The defense did not call any witnesses, and the defendant chose not to testify. The defense rested.

¶ 20    During closing arguments, the State argued that the evidence—particularly the Hangar 9 surveillance video and photographic exhibits—proved beyond a reasonable doubt that the defendant repeatedly and brutally stabbed Creer with a knife. The prosecutor maintained the attack was largely unprovoked, emphasizing that Creer believed he was going outside for a fistfight, removed his shirt, and was unarmed. According to the State, once Creer realized the defendant had a knife, he disengaged and attempted to flee, while the defendant pursued him, stabbing him

11

multiple times in the thigh/hip, back, shoulder, and slashing his forehead. The State highlighted that the video showed the defendant hiding near a corner, producing a knife, and making repeated stabbing motions, was corroborated by Creer's wounds and photographs admitted into evidence. The State contended that each wound constituted a separate aggravated battery, that Creer suffered great bodily harm and permanent disfigurement, and that the defendant, a convicted felon, unlawfully possessed and used a knife against another person. The State further argued that witness identifications, clothing recovered from the defendant's vehicle, and circumstantial evidence left no doubt that the defendant was the assailant.

¶ 21    Defense counsel responded that the investigation was incomplete and unreliable, stressing the missing surveillance footage from inside and other exterior areas of Hangar 9, the absence of a recovered weapon, the lack of DNA testing and medical records, and the intoxication and memory gaps of key witnesses. Counsel argued that the short video clip did not capture the critical events leading up to the confrontation and it was unclear who initiated the encounter or what was said beforehand. The defense emphasized that Creer could not identify the defendant as his attacker, did not remember much of the night, and denied being knocked down as depicted by the State's interpretation of the video. Counsel argued that the multiple aggravated battery counts improperly subdivided what was, at most, a single brief altercation. The defense challenged the State's reliance on the jail call as speculative and asserted that the evidence left reasonable doubt as to identity, intent, and the existence of a knife.

¶ 22    During closing, defense counsel asserted that self-defense had been raised as an affirmative defense, prompting an objection by the State that no such defense had been filed. The court overruled the objection, and defense counsel maintained that an amended affirmative defense of self-defense had been filed, arguing that the defendant's conduct should be assessed from his

12

perspective at the time, given what he reasonably believed was occurring. The defense ultimately requested findings of not guilty on all counts.

¶ 23     In rebuttal, the State argued that by asserting self-defense, the defense necessarily admitted the stabbing, leaving only the question of whether the conduct was justified. The State argued that the video evidence squarely refuted any self-defense theory. The prosecutor maintained that the defendant had numerous opportunities to avoid or retreat from the encounter—by remaining inside the bar, going toward a populated street, or leaving the area—but instead walked outside first, hid near a corner, lay in wait, and ambushed Creer. The State emphasized that Creer was visibly unarmed, running away, and defenseless when the defendant pursued and stabbed him multiple times, including while Creer was on the ground. The prosecutor argued that the defendant's conduct—chasing, hiding, and continuing the attack despite third-party intervention—demonstrated aggression rather than self-defense. The State dismissed claims about missing evidence as immaterial in light of the clear video evidence and circumstantial proof, contending the only "holes" in the case were the stab wounds inflicted on Creer. The State urged the court to reject self-defense, find that the State had proved each count beyond a reasonable doubt, and enter guilty findings on all charges. After considering the arguments of counsel and the evidence and testimony presented throughout the bench trial, the trial court found the defendant guilty on each count charged by the State.

¶ 24     After several continuances due partially to both defense counsel and the prosecutor leaving their respective offices, on July 27, 2023, new counsel for the defendant filed a posttrial motion requesting the trial court vacate the findings of guilty or conduct a new trial. The defendant argued (1) the State failed to prove the defendant guilty of UUWF and aggravated battery beyond a reasonable doubt, (2) the trial court erred in denying the motion for directed verdict, (3) the

13

convictions for aggravated battery violated the one-act, one-crime doctrine, and (4) the defendant was denied effective assistance of counsel for failing to adequately investigate and present witnesses regarding the defendant's affirmative defense of self-defense.

¶ 25    On December 15, 2023, a hearing on the defendant's posttrial motion was held. After arguments presented by both parties, the trial court denied the defendant's posttrial motion and proceeded to a sentencing hearing. Based upon the evidence presented at the sentencing hearing, the trial court agreed with the State's recommendation that counts I-IV should merge with count V, and sentenced the defendant to consecutive terms of 5 years' imprisonment for aggravated battery causing great bodily harm (count V) and 12 years' imprisonment for unlawful possession of weapons by a felon (count VI).

¶ 26    On December 20, 2023, the defendant filed a motion to reconsider sentence, arguing that the trial court erred by ordering the sentences to run consecutively and not concurrently, and the sentence was excessive based on the evidence in aggravation and mitigation. The defendant's motion to reconsider the sentence was denied on January 12, 2024. The defendant filed a timely notice of appeal on January 16, 2024.

¶ 27                                    II. ANALYSIS

¶ 28    On appeal, the defendant raises three issues: (1) whether his constitutional right to confront witnesses was violated when the trial court allowed the State to elicit statements attributed to Justice Garnon, which the defendant also characterizes as inadmissible hearsay and improper character evidence; (2) whether the State failed to prove beyond a reasonable doubt that the defendant possessed a knife and caused great bodily harm; and (3) whether trial counsel was ineffective for failing to object to the admission of statements from Garnon.

14

¶ 29    A. Plain Error, Right to Confront Witnesses, Hearsay, and Character Evidence

¶ 30    Specifically, the defendant first contends that the trial court erred and his convictions must be reversed because (1) the admission of Garnon's statements to Sergeant Pingolt were testimonial in nature, citing *Crawford v. Washington*, 541 U.S. 36 (2004), and violated the confrontation clause where she did not testify; (2) her statements repeated through Creer and Appiah were out-of-court assertions offered to prove what occurred during the fight rather than for a nonhearsay purpose; and (3) her statements portraying the defendant as "aggressive" or as engaging in "stalking" improperly suggested a violent character and were used to show he acted in conformity with that character on the night of the offense. The defendant did not argue for plain-error review in his opening brief. The State responds that the defendant forfeited review of these claims by failing to preserve them in the trial court and by not invoking the plain-error doctrine in his opening brief. In the alternative, the State argues that the defendant has failed to meet its burden in establishing that plain error occurred. For the first time in his reply brief, the defendant asked this court to review these claims under both prongs of the plain-error doctrine.

¶ 31    As an initial matter, we first address the defendant's failure to argue plain error in his initial brief. Points not argued in an initial brief "are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). "In the absence of a plain-error argument by a defendant, we will generally honor the defendant's procedural default." *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010) (citing *People v. Hillier*, 237 Ill. 2d 539, 549 (2010)). "However, although defendant did not argue plain error in his opening brief, he has argued plain error in his reply brief, which is sufficient to allow us to review the issue for plain error." *Id.* (citing *People v. Williams*, 193 Ill. 2d 306, 347-48 (2000)). Accordingly, we will address the defendant's claim.

15

¶ 32    Nevertheless, the availability of plain-error review does not relieve the defendant of his burden to establish that plain error actually occurred. "Whether there is plain error is a question of law that this court reviews *de novo*." *People v. Marcum*, 2024 IL 128687, ¶ 28. The doctrine is a narrow and limited exception. *Hillier*, 237 Ill. 2d at 545. Under the plain-error doctrine, a reviewing court may consider unpreserved error when:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

See also *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005).

¶ 33    In addition, and as the State aptly notes, this case was tried as a bench trial. Thus, our analysis is informed by a well-settled presumption: the trial court is presumed to have considered only competent and admissible evidence and to have disregarded any improper evidence in reaching its verdict. *People v. Naylor*, 229 Ill. 2d 584, 603 (2008); *People v. Gilbert*, 68 Ill. 2d 252, 258-59 (1977). This presumption may be overcome only where the record affirmatively demonstrates that the trial court relied on the challenged evidence. *Naylor*, 229 Ill. 2d at 603-04.

¶ 34    Here, although Garnon's statements were introduced through the testimony of police officers and other witnesses, including statements that the defendant was "stabbing" the victim, that the defendant was "aggressive," and that Garnon was attempting to distance herself from the defendant, the record does not affirmatively demonstrate that the trial court relied on those statements in finding the defendant guilty. The court made no express findings referencing Garnon,

16

her credibility, or any alleged character traits attributed to the defendant, nor did it indicate that it relied on any out-of-court statements for their truth rather than merely as background explaining the course of the investigation and the actions of other witnesses. The defendant, therefore, has not rebutted the presumption that the trial court disregarded any improper evidence.

¶ 35    Moreover, the defendant raised self-defense as an affirmative defense at trial, which necessarily concedes that he engaged in the physical altercation and used force against the victim, while denying legal responsibility for that conduct. See *People v. Freneey*, 2016 IL App (1st) 140328, ¶ 32; *People v. Brant*, 394 Ill. App. 3d 663, 671 (2009) ("The legal effect of an affirmative defense is to admit that the acts occurred, but to deny responsibility." (Internal quotation marks omitted.)). Such a concession further undermines his claim that the challenged statements regarding identification or the occurrence of a stabbing affected the outcome of the trial. Under these circumstances, the defendant cannot establish that any alleged evidentiary error affected the outcome of the bench trial. "Absent reversible error, there can be no plain error." *Naylor*, 229 Ill. 2d at 602.

¶ 36    Given this posture, we need not engage in an extended analysis of whether Garnon's statements were testimonial under *Crawford*, constituted inadmissible hearsay, or amounted to improper character evidence. Even assuming, *arguendo*, that some or all of the challenged statements were admitted in error, the defendant is not entitled to relief under either prong of the plain-error doctrine where the record fails to show reliance on those statements in determining the defendant's guilt and the remaining properly admitted evidence independently supports the convictions. In a bench trial, "a reviewing court presumes that the trial court considered only admissible evidence and disregarded inadmissible evidence in reaching its verdict," and that presumption may only be rebutted where the record affirmatively demonstrates otherwise. *Id.* at

17

603; see also *People v. Deenadayalu*, 331 Ill. App. 3d 442, 450 (2002); *People v. Pelegri*, 39 Ill. 2d 568, 575 (1968).

¶ 37 Further, the admissible evidence against the defendant was substantial. The State presented, *inter alia*: (1) two surveillance videos depicting the defendant's involvement; (2) the defendant's white bucket hat and clothing depicted in the videos, identified by witnesses, and later found in the defendant's vehicle; (3) specific identification of the defendant by Jones and Appiah; (4) Creer's testimony that he observed a metal blade in the defendant's hand; (5) Creer's demonstration to the trial court of the defendant's hand position during the altercation being consistent with a stabbing motion; (6) the defendant's vehicle seen leaving Hangar 9 immediately after the stabbing; and (7) photographs and testimony from Creer and police describing the extent of the injuries and as consistent with being stabbed. Based upon the defendant's failure to rebut the presumption that the trial court disregarded inadmissible evidence and in light of the other evidence admitted at trial, the defendant has not established his claim of plain error under the first prong.

¶ 38 Lastly, to establish second-prong plain error, a defendant must show the error affected the fairness of the trial and challenged the integrity of the judicial process. *Piatkowski*, 225 Ill. 2d at 565. Illinois courts have equated second-prong plain error with "structural error." *People v. Jackson*, 2022 IL 127256, ¶ 28. "An error is typically designated as structural only if it necessarily renders a criminal trial fundamentally unfair or is an unreliable means of determining guilt or innocence." *People v. Moon*, 2022 IL 125959, ¶ 28. The United States Supreme Court has recognized errors as "structural" only in a " 'very limited class of cases.' " *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)). "Confrontation clause violations *** are not 'structural defects in the constitution of the trial mechanism' that affect '[t]he entire conduct of the trial from

18

beginning to end.' " *People v. Patterson*, 217 Ill. 2d 407, 424 (2005) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991)). Rather, this type of error "is more accurately described as a 'trial error,' *i.e.*, an 'error which occurred during the presentation of the case to the jury.' " *Id.* at 424-25 (quoting *Fulminante*, 499 U.S. at 307-08).

¶ 39 Even if, as the defendant argues, the admission of the disputed statements resulted in a violation of the confrontation clause, it is not subject to second-prong plain error review because it is a trial error, not a structural defect in the trial process. The error did not deprive the defendant of a fair trial or challenge the integrity of the judicial process. Thus, it does not rise to the level of second-prong plain error.

¶ 40 Accordingly, the defendant has failed to demonstrate that the evidence at trial was closely balanced, or an error so serious as to undermine the integrity of the judicial process. The forfeiture therefore stands, and the defendant's confrontation clause, hearsay, and character-evidence claims do not warrant reversal.

¶ 41                                    B. Sufficiency of the Evidence

¶ 42 Next, the defendant argues that the State failed to prove beyond a reasonable doubt that he knowingly possessed a knife for purposes of unlawful use of a weapon by a felon (UUWF) and that he caused great bodily harm to Creer. When reviewing a sufficiency challenge, the question is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). The trier of fact is responsible for weighing evidence, resolving conflicts in testimony, and drawing reasonable inferences, and this court will not substitute its judgment for that of the trial court. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009); *People v. Campbell*, 146 Ill. 2d 363, 374-75 (1992). "Circumstantial evidence is proof of

19

facts or circumstances that give rise to reasonable inferences of other facts that tend to establish guilt or innocence of the defendant." *People v. Saxon*, 374 Ill. App. 3d 409, 417 (2007). It is axiomatic that "[a] defendant can be convicted solely on circumstantial evidence," and that "[t]he trier of fact does not have to be satisfied beyond a reasonable doubt as to each link in the chain of circumstantial evidence." *Id.*

¶ 43    With respect to the UUWF conviction, the defendant contends the State failed to prove he knowingly possessed a knife, pointing to the absence of a recovered weapon and purported inconsistencies in witness testimony. The State responds that the defendant admitted intentional use of force by raising self-defense, which presupposes that he engaged in the conduct, and therefore cannot now argue insufficient evidence to convict. The State emphasizes that Creer's testimony and injuries, supported by surveillance video and officers' observations, provided direct and circumstantial evidence that the defendant possessed a knife.

¶ 44    The defendant's assertion of self-defense is significant, because " 'the raising of such a defense necessarily constitutes an admission by the defendant that he committed the crime for which he is being prosecuted.' " *People v. Chatman*, 381 Ill. App. 3d 890, 897 (2008) (quoting *People v. Raess*, 146 Ill. App. 3d 384, 391 (1986)). By asserting self-defense, the defendant necessarily conceded that he engaged in the physical altercation with Creer and intentionally used force, disputing only whether that conduct was legally justified. *People v. Cacini*, 2015 IL App (1st) 130135, ¶ 44. Although this admission does not constitute a concession that the defendant used a knife, it establishes that the defendant used intentional force against the victim and permits the trier of fact to determine the nature and means of that force from the totality of the evidence. This concession does not relieve the State of its burden of proof, but it is relevant to the sufficiency

20

analysis because it undermines the defendant's claim that the evidence was insufficient to establish the occurrence of the charged conduct itself.

¶ 45     Here, the evidence was sufficient for the trial court to conclude beyond a reasonable doubt that the defendant knowingly possessed a knife. Creer testified that he observed a metal blade in the defendant's hands and fled because he feared being stabbed. Specifically, Creer testified at trial that he "was trying to get away because [the defendant] had a blade." Officers Stein and Arenas testified to multiple stab wounds on Creer consistent with knife injuries, photographed the injuries and blood-soaked clothing, and testified to the video depicting the defendant placing an object in his back pocket. Surveillance video corroborated Creer's testimony, showing the defendant chasing the victim, striking him multiple times with a stabbing motion, and standing over him while making a slashing motion. Further, Officer Arenas testified that based on his training, experience, and own observation of Creer's injuries, he "immediately knew [Creer] had been slashed or stabbed by a sharp object." Additionally, the location of Creer's injuries was consistent with the areas of his body where the surveillance video depicts the defendant using a stabbing or slashing motion while making contact with Creer during the altercation. The trial court was entitled to credit this evidence and draw reasonable inferences from it. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). When viewed in the light most favorable to the State, the defendant's acknowledgment of force, combined with the Creer's testimony, video evidence, and the nature and location of Creer's injuries, provided a rational basis for the trial court to find that the defendant knowingly possessed a knife.

¶ 46     Regarding the aggravated battery conviction, the defendant argues that the State failed to prove that he caused Creer great bodily harm. The State counters that Creer's multiple stab wounds, significant blood loss, permanent scarring, and nerve damage requiring plastic surgery

21

demonstrated great bodily harm. The State points out that the severity of the injuries was corroborated by photographs, surveillance video, and officer testimony.

¶ 47    The trial evidence demonstrated that Creer suffered four significant stab wounds to the forehead, left shoulder, left back, and left thigh, as well as abrasions resembling road rash. Officer Stein testified that the forehead wound measured five to six inches. Creer received medical treatment, and photographs of his injuries and blood-soaked clothing were admitted into evidence. Creer suffered permanent scarring to his forehead, nerve damage to his left arm that requires additional plastic surgery, and lingering psychological effects, including fear of going outside. Multiple witnesses, including the Creer and officers, described the severity of the stab wounds and blood loss. These facts exceed the threshold for great bodily harm recognized in Illinois law. See *People v. Cisneros*, 2013 IL App (3d) 110851, ¶¶ 13, 21; *People v. Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 19. Credibility determinations, including the weight given to Creer's testimony, were within the trial court's province. *People v. Smith*, 185 Ill. 2d 532, 541 (1999); *People v. Connolly*, 322 Ill. App. 3d 905, 919 (2001). Even in the absence of expert medical testimony regarding the nerve damage or permanent scarring, the trial court could reasonably conclude that Creer suffered great bodily harm. *Cisneros*, 2013 IL App (3d) 110851, ¶ 21; *People v. Ford*, 2015 IL App (3d) 130810, ¶ 35. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find beyond a reasonable doubt that the defendant inflicted great bodily harm.

¶ 48                          C. Ineffective Assistance

¶ 49    Finally, the defendant alleges his trial counsel was ineffective by failing to properly object to the admission of Garnon's out-of-court statements on confrontation clause, hearsay, and character-evidence grounds. The defendant contends that counsel's objections were either

22

incomplete or raised on the wrong basis and that counsel failed to seek limiting instructions, thereby allowing the State to introduce highly prejudicial evidence identifying the defendant as the offender, portraying him as aggressive, and influencing the court's ultimate findings. The defendant maintains that absent Garnon's statements, the State's case would have been substantially weaker.

¶ 50    The State responds that the defendant cannot satisfy either prong of *Strickland*. The State notes that trial counsel objected when Garnon's statements were first introduced, and that the trial court overruled the objection after limiting the testimony to explaining the course of the police investigation. The State further asserts that any subsequent decision not to object to similar testimony elicited through other witnesses was a reasonable matter of trial strategy. The State also argues that the defendant cannot demonstrate prejudice, because the State did not rely on Garnon's statements in closing argument, substantial independent evidence established the defendant's guilt, and the defendant effectively admitted the charged conduct by raising the affirmative defense of self-defense.

¶ 51    Ineffective assistance of trial counsel claims are subject to the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To succeed on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness, and (2) the deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687; *People v. Evans*, 186 Ill. 2d 83, 93 (1999).

¶ 52    To satisfy the deficiency prong of *Strickland*, counsel's performance must be so deficient that counsel was "not functioning as the 'counsel' guaranteed by the sixth amendment [(U.S. Const., amend. VI)]." *People v. Easley*, 192 Ill. 2d 307, 317 (2000). A party raising this claim must

23

overcome "the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy." *People v. Coleman*, 183 Ill. 2d 366, 397 (1998).

¶ 53    To satisfy the prejudice prong of *Strickland*, the defendant must demonstrate, but for counsel's deficient performance, there is a reasonable probability the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *People v. Houston*, 226 Ill. 2d 135, 144 (2007). Failure to satisfy either prong defeats the claim. *Strickland*, 466 U.S. at 697; *Coleman*, 183 Ill. 2d at 397. A claim of ineffective assistance of counsel is reviewed *de novo. People v. Lewis*, 2022 IL 126705, ¶ 48.

¶ 54    Even assuming, *arguendo*, that trial counsel's performance was deficient in failing to object more precisely or consistently to Garnon's statements, the defendant cannot establish prejudice. This case was tried as a bench trial, and the trial court is presumed to have considered only competent evidence and to have disregarded any improper evidence unless the record affirmatively shows otherwise. *Naylor*, 229 Ill. 2d at 603-04; *Gilbert*, 68 Ill. 2d at 258-59. In evaluating whether trial counsel's failure to object to the challenged evidence was prejudicial, the record must be examined in light of this presumption. Because the trial court is presumed to have ignored any inadmissible statements, the defendant cannot show that counsel's omissions affected the verdict unless the record indicates the court actually relied on the disputed evidence.

¶ 55    As discussed above, the record does not affirmatively demonstrate that the trial court relied on Garnon's statements in finding the defendant guilty. The court made no express findings referencing Garnon's statements, her credibility, or any alleged character traits attributed to the defendant. Where the record fails to show reliance on the challenged evidence, a defendant cannot establish that counsel's alleged errors affected the outcome of the trial. *Id.*

24

¶ 56    Moreover, the properly admitted evidence identifying the defendant and establishing his guilt was substantial and independent of Garnon's statements. Surveillance video admitted at trial depicted the defendant participating in the altercation, wearing a distinct white bucket hat. Multiple witnesses identified the defendant as the individual involved in the fight, and police later recovered a white bucket hat matching the one seen in the video from the defendant's vehicle. Creer testified that he observed a blade in the defendant's hands during the altercation. Officers described multiple puncture-type injuries consistent with stabbing. This evidence provided a coherent and reasonable basis for the trial court's findings, irrespective of any statements attributed to Garnon.

¶ 57    In addition, the defendant raised the affirmative defense of self-defense. While the State bore the burden of disproving that defense, the defendant's assertion of self-defense necessarily acknowledged his involvement in the altercation and the infliction of the victim's injuries. The trial court's rejection of the defense was based on the absence of evidence supporting justification and the video surveillance, not on Garnon's statements. Here, where the convictions rest on strong, independent evidence and the failure of an affirmative defense, the defendant cannot demonstrate a reasonable probability that the result would have been different absent counsel's alleged errors.

¶ 58    Accordingly, because the defendant has not shown that trial counsel's performance affected the outcome of the proceedings, his ineffective assistance of counsel claim fails.

¶ 59                                III. CONCLUSION

¶ 60    For the foregoing reasons, we affirm the defendant's convictions for aggravated battery and unlawful possession of weapons by a felon. We reject the defendant's confrontation clause, hearsay, and character-evidence claims where he has failed to establish plain error. We affirm the sufficiency of the evidence supporting the convictions. We also deny the defendant's claim of ineffective assistance of counsel.

25

¶ 61   Affirmed.